# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WASEEM DAKER,                          :
                                       :
        Plaintiff,                    :
                                       :
      v.                             :       CIVIL ACTION NO.
                                       :       1:03-CV-02481-RWS
JOE FERRERO, et al.,                   :
                                       :
        Defendants.                   :

## <u>ORDER</u>

This case comes before the Court for resolution of Defendants' Motion for Summary Judgment [220]; Plaintiff's Motion for Summary Judgment [234]; and Plaintiff's Motion to Amend his Complaint [245].  After reviewing the record, the Court enters the following Order.

## Background

Plaintiff, proceeding *pro se*, initiated this civil action in August 2003 against Defendant Joe Philip Ferrero, Acting Commissioner of the Georgia Department of Corrections ("GDC"), and numerous prison officials.  In his Fourth Amended Complaint, Plaintiff asserts nineteen claims pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act

AO 72A
(Rev.8/82)

("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq., challenging aspects of his

confinement in various GDC prison facilities.  Specifically, Plaintiff challenges:

(i) a requirement that he "stand at attention" in the presence of prison officials;

(ii) a restriction on his wearing of a Kufi, a traditional article of Muslim

headdress; (iii) a denial of his request to possess a digital device containing the

text of the Qur'an; (iv) content-based restrictions on the sending and receiving

of prisoner mailings and publications; and (v) the sufficiency of the procedures

afforded to inmates and senders of mail when prisoners are denied certain

mailings and publications.[1]   On October 25, 2005, Plaintiff was released from

---

[1] A number of Plaintiff's claims purport to challenge the facial constitutionality
of certain prison policies.  However, as the Court discusses below, the scope of this action
is significantly limited by mootness considerations because Plaintiff has been released
from prison.  See Wardell v. Duncan, 470 F.3d 954, 957 (10th Cir. 2006) (noting that,
"[a]lthough the complaint suggests a broad facial attack on the regulations prohibiting gift
purchases of subscriptions and the like, the case has been narrowed substantially"
because the plaintiff had been released from prison).  For ease of reference, the Court
details below the list of policies Plaintiff purports to challenge in his Complaint:

Claim 1:  Stand-at-attention requirement
Claim 2:  Restrictions on wearing a Kufi
Claim 3:  Content-based denial of mail and publications
Claim 4:  Denial of procedural due process when mail denied
            (prisoners)
Claim 5:  Denial of procedural due process when mail denied (non-
            prisoners)
Claim 6:  Requirement that mail be addressed to dormitory
Claim 7:  Denial of procedural due process when publications denied

2

prison, but he continues to pursue this litigation.

This Court has previously dismissed on sovereign immunity and
mootness grounds Plaintiff's claims against Defendants in their official
capacities.[2]  The Court has also dismissed Plaintiff's digital-Qur'an claim, after

---

                            (prisoners)
Claim 8:  Content-based denial of foreign language publications
Claim 9:  Denial of procedural to process when publications restricted
                 (non-prisoners)
Claim 10: Denial of gift publications (that are not paid in full by prisoner)
Claim 11: Pre-paid Requirement for publications
Claim 12: Requirement that Prisoner request book by name, title,
                 and description
Claim 13: Restrictions on size and number of publications possessed
Claim 14: Seizure of publication without procedural due process
Claim 15: Denial of legal materials of other inmates
Claim 16: Requirement that printed material be received from publishers
                 or attorney
Claim 17: Requirement that specific request be made to receive
                 publications from dealer
Claim 18: Retaliation for filing this action and related grievances
Claim 19: Denial of Digital Qur'an

[2]  By previous Order, this Court dismissed Plaintiff's official-capacity claims
under RLUIPA and § 1983 for monetary damages, concluding that the Eleventh
Amendment barred such claims.  See Daker v. Ferrero, No. 1:03-CV-02481, 2006 WL
346440, at *8 n.5 (N.D. Ga. Feb. 13, 2006) [hereinafter Daker I] (discussing Order of
Aug. 15, 2005 [Doc. No. 122] at 12-14); see also Madison v. Virginia, __ F.3d __,
2006 WL 3823181, at *9-10 (4th Cir. Dec. 29, 2006) (ruling that states do not
waive their sovereign immunity as to damages actions under RLUIPA).  The Court
also dismissed Plaintiff's claims for injunctive relief, finding that those claims were
mooted by Plaintiff's release from prison.  Id. at *7.  Thus, no claims remain in the instant
action against Defendants in their official capacities, and Plaintiff's sole remedy is thus

finding that Defendants were entitled to qualified immunity because the right to a digital Qur'an was not clearly established.  See Daker v. Ferrero, No. 1:03-CV-02481, 2006 WL 346440, at *2 (N.D. Ga. Feb. 13, 2006) [hereinafter Daker I] (discussing Order of Aug. 15, 2005).

The Court now takes up Plaintiff's remaining claims, which, by virtue of the Court's previous rulings, are brought solely against Defendants in their individual capacities.

## Discussion

**I.      Preliminary Matters**

### A.      Plaintiff's Claims Brought as a Non-Prisoner

Following Plaintiff's release from prison in October 2005, Plaintiff sought to amend his Complaint for a fourth time to add several claims arising both during his incarceration and after he was released from prison.  By previous Order, the Court granted Plaintiff leave to add his claims arising out of his incarceration, but denied Plaintiff leave to add claims arising after his release, finding that "Plaintiff's release from prison altered his position in such a dramatic and fundamental way that claims brought in his capacity as a non-

_____

monetary relief.

4

incarcerated citizen should not be conflated with those he initiated as a prisoner." <u>Daker I</u>, 2006 WL 346440, at *6.

Plaintiff's Fourth Amended Complaint asserts two claims as a non-prisoner. Claim 5 alleges that due process requires that the sender of mail to a prisoner be afforded notice and an opportunity to appeal a decision by prison officials to censor the mail. (<u>See</u> Fourth Am. Compl. ¶ 85.) Similarly, Claim 9 alleges that due process requires a sender of a publication to a prisoner to be afforded notice and an opportunity to appeal a censorship decision. (<u>See</u> <u>id.</u> ¶ 89.) In its previous Order, the Court declined to grant Plaintiff leave to assert as a non-prisoner claims arising after his release from prison. As such, the Court hereby **DISMISSES** without prejudice Claims 5 and 9.[3] (<u>See</u> Pl.'s Compl. ¶¶ 85, 89.)

## B.   Plaintiff's Motion for Leave to Amend

By Order dated January 3, 2007, this Court observed that Plaintiff's Fourth Amended Complaint appeared to omit any claims against Defendants in

---

[3] Plaintiff alleges that several of his mailings to other prisoners were unconstitutionally "returned to sender" because several prison facilities require mail to be specifically addressed by dormitory. The Court takes up these allegations *infra* in Section IV-E-1 in its discussion of Plaintiff's challenge to several prisons' address labeling requirements (Claim 6).

5

their individual capacities.  In view of Plaintiff's *pro se* status, the Court

allowed Plaintiff to show cause as to why the Court should not treat Plaintiff's

omission as a waiver or an abandonment of his individual-capacity claims.

Plaintiff has since sought leave to correct his "typographical" error, by

amending his Fourth Amended Complaint to include the word "individual" in

place of or in addition to "official" where relevant.  Plaintiff points out that, in

all previous renditions of his Complaint, he has included claims against

Defendants in their individual capacities, and has otherwise aggressively

pursued those claims in his summary judgment papers.

     Having considered the filings on this matter, the Court concludes that

Plaintiff has made a sufficient showing that he did not abandon or waive his

claims against Defendants in their individual capacities by omitting them from

his Fourth Amended Complaint.  Moreover, the Court finds that Defendants,

who have fully briefed for purposes of summary judgment their defenses to

Plaintiff's individual-capacity claims, and have otherwise conducted their

efforts in this litigation consistent with an understanding that Plaintiff has

maintained individual-capacity claims, will not be prejudiced by the Court

granting Plaintiff leave to amend.  The Court reads Plaintiff's Complaint to

6

assert claims against Defendants in their individual capacities.  Accordingly,

Plaintiff's Motion to Amend his Complaint [245] is **GRANTED**.

Having resolved these preliminary matters, the Court turns to address the

merits of the parties motions for summary judgment.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions,

and affidavits submitted by the parties show that no genuine issue of material

fact exists and that the movant is entitled to judgment as a matter of law.  FED.

R. CIV. P. 56(c).  The court should view the evidence and any inferences that

may be drawn from it in the light most favorable to the non-movant.  Adickes v.

S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142

(1970).  The party seeking summary judgment must first identify grounds that

show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden

then shifts to the non-movant, who must go beyond the pleadings and present

affirmative evidence to show that a genuine issue of material fact does exist.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed.

2d 202 (1986).

7

### III.   Individual Capacity Claims under RLUIPA

As an initial matter, the Court turns to examine whether RLUIPA authorizes Plaintiff to recover damages against Defendants in their individual capacities.  In a previous Order, the Court examined this question and, while not definitively resolving it, tentatively concluded that RLUIPA permits suit against prison officials in their individual capacities.[4]  See Daker I, 2006 WL 346440, at *10.  Since the entry of that Order, however, the Court has had the occasion to consider a new argument, in part raised by Defendants, in support of their contention that RLUIPA does not authorize suits for monetary damages against individuals.  After reconsidering the issue, the Court now concludes that,

---

[4] The Court concluded that, "[i]n sum, this Court reads the RLUIPA to permit suit against state officials in their individual capacities." Daker I, 2006 WL 346440, at *10. But recognizing the emerging nature of RLUIPA jurisprudence, the Court withheld a final disposition of the issue.  It explained:

> In light of the nascent and emerging nature of RLUIPA jurisprudence, the Court does not rule out the possibility that the reasoning expressed in some intervening decision might persuade it to depart from its current position.  The arguments raised by Defendants to date, however, do not convince the Court that a more constrained reading of the RLUIPA[, namely, construing it to exclude claims against prison officials in their individual capacities,] is the correct one.

See id. at *8 n.7.

8

because construing RLUIPA to authorize individual damages actions would raise a substantial question concerning its constitutionality under the Spending and Commerce Clauses of the United States Constitution, the constitutional avoidance canon compels this Court to construe RLUIPA against authorizing such actions.  Plaintiff's sole remedy at law, therefore, lies in 42 U.S.C. § 1983.

### A.    Constitutional Avoidance Canon

Under the canon of constitutional avoidance, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."  Jones v. United States, 526 U.S. 227, 239, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999) (quoting United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S. Ct. 527, 53 L. Ed. 836 (1909))).  In a more recent iteration of the rule, the Supreme Court has said that, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice.  If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to

AO 72A
(Rev.8/82)

the particular litigant before the Court." <u>Clark v. Martinez</u>, 543 U.S. 371, 380-81, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005).

The avoidance canon "rests upon our 'respect for Congress, which we assume legislates in the light of constitutional limitations.' " <u>Harris v. U.S.</u>, 536 U.S. 545, 556, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002) (quoting <u>Rust v. Sullivan</u>, 500 U.S. 173, 191, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991)).  It is an "axiom of statutory interpretation," <u>Public Citizen v. U.S. Dept. of Justice</u>, 491 U.S. 440, 466, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989), which "allows courts to avoid the decision of constitutional questions . . . on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." <u>Clark</u>, 543 U.S. at 381 (citing <u>Rust</u>, 500 U.S. at 191); <u>see</u> <u>also</u> <u>Public Citizen</u>, 491 U.S. at 466 (stating that courts are "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils"); <u>United States v. Lovett</u>, 328 U.S. 303, 320, 66 S. Ct. 1073, 1081, 90 L. Ed. 1252 (1946) (Frankfurter, J., concurring) ( "[T]he most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible.").

10

The avoidance canon applies only if two preconditions are met.  First, the statute at issue must be ambiguous on its face.  Thus, the canon "enters in only 'where a statute is susceptible of two constructions,' " Penn. Dep't of Corrections v. Yeskey, 524 U.S. 206, 212, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998) (quoting United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S. Ct. 527, 535-536, 53 L. Ed. 836 (1909)), and "has no application in the absence of statutory ambiguity." United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483, 494, 121 S. Ct. 1711, 149 L. Ed. 2d 722 (2001); see also McConnell v. Federal Election Comm'n, 540 U.S. 93, 180, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").  Second, one construction of the statute must raise a sufficiently "serious question" regarding its constitutionality.  See, e.g., Verizon Communications, Inc. v. F.C.C., 535 U.S. 467, 523, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002); cf. Almendarez-Torres v. United States, 523 U.S. 224, 250, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998) (Scalia, J., dissenting)

11

(stating that the doctrine "requires merely a determination of serious

constitutional *doubt*, and not a determination of *unconstitutionality*") (emphasis

in original).

### B.    The Text of RLUIPA Concerning Individual-Capacity Damages Actions

Having reviewed the contours of the constitutional avoidance canon, the

Court turns first to examine whether Section 3 of RLUIPA is ambiguous

regarding its authorization of suits for damages against officials in their

individual capacities.

Congress enacted Section 3 of RLUIPA in part to provide enhanced

protection to religious exercise in penal institutions.  See 114 Stat. 804, 42

U.S.C. § 2000cc-1 et seq.; see generally Cutter v. Wilkinson, 544 U.S. 709, 125

S. Ct. 2113, 161 L. Ed. 2d 1020 (2005).  Section 3 provides in pertinent part

that "[n]o government shall impose a substantial burden on the religious

exercise of a person residing in or confined to an institution," unless the burden

furthers "a compelling governmental interest," and does so by "the least

restrictive means."  42 U.S.C. § 2000cc-1(a).  It applies insofar as a state prison

institution "receives Federal financial assistance" or "the substantial burden

affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes."  42 U.S.C. § 2000cc-1(b).

RLUIPA expressly provides for a private right of action for individuals whose religious exercise is unlawfully burdened while incarcerated in prison. See 42 U.S.C. § 2000cc-2.  Accordingly, "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  While § 2000cc-2 provides only that individual actions under RLUIPA may be brought "against a government," RLUIPA defines "government" as follows:

> (i) a State, county, municipality, or other governmental entity created under the authority of a State;
>
> (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and
>
> (iii) any other person acting under color of State law.

42 U.S.C. § 2000cc-5(4).

Since the enactment of RLUIPA in 2000, no federal appellate court has yet addressed whether the provisions cited above authorize suit against an

AO 72A
(Rev.8/82)

individual prison official in his or her individual capacity.  Cf. Lovelace v. Lee, 472 F.3d 174, 196-99 & n.7 (4th Cir. 2006) (gathering district court cases). However, a division among district courts has emerged, with courts divided on the question.  At least one early case, reasoning that RLUIPA only provided for an individual action against a "government," held that individual-capacity suits were foreclosed by its plain text.  See Hale O Kaula Church v. Maui Planning Commission, 229 F. Supp. 2d 1056, 1067 (D. Haw. 2002) ("RLUIPA provides a cause of action against 'governments' and does not appear to allow causes of action against individuals.").[5]

But several decisions handed down after O Kaula Church came to the opposite conclusion, noting that the reasoning expressed in O Kaula Church "misses the mark" because "government" is explicitly defined in RLUIPA as including a "person acting under color of State law."  See, e.g., Guru Nanak Sikh Society of Yuba City v. County of Sutter, 326 F. Supp. 2d 1128, 1136 (E.D. Cal. 2003).  Relying on the "under color of" language, which parallels

---

[5] A more recent case has adopted similar reasoning.  See Morris-El v. Menei, No. Civ.A. 00-200J, 2006 WL 1455592, at *3 (W.D. Pa. May 22, 2006) ("Further, RLUIPA does not contemplate recovering damages from individuals, such as the defendants. Instead, RLUIPA provides for 'appropriate relief against a government.' ").

almost identical language in Section 1983, these courts have ruled, albeit with reservation, that RLUIPA permits individual-capacity suits for damages.[6] <u>See Daker I</u>, 2006 WL 346440, at *9-10 (concluding, though finding it an "unpalatable proposition," that individual-capacity suits were available under RLUIPA because its "under color of" language "tracks so closely" the language of § 1983); <u>Blount v. Johnson</u>, No. 7:04CV00429, 2006 WL 3746682, at *9-10 (W.D. Va. Dec. 18, 2006) (allowing RLUIPA claim to proceed against prison official in individual capacity after rejecting qualified immunity defense); <u>Shidler v. Moore</u>, 409 F. Supp. 2d 1060, 1067, 1071 (N.D. Ind. 2006) (recognizing RLUIPA damages claim against official in individual capacity); <u>Blount v. Johnson</u>, No. 7:04CV00429, 2006 WL 3746682, at *9-10 (W.D. Va. Dec. 18, 2006) (allowing RLUIPA claim to proceed against prison official in individual capacity after rejecting qualified immunity defense); <u>cf. Charles v. Verhagen</u>, 220 F. Supp. 2d 937, 953 (W.D. Wis. 2002) (apparently recognizing RLUIPA claim for individual money damages but finding that prison officials

---

[6] One court, however, has gone farther and expressed confidently that "[c]learly the Act contemplates individual liability. . . ."  <u>Orafan v. Goord</u>, No. 00CV2022, 2003 WL 21972735, at *9 (N.D.N.Y. Aug. 11, 2003).

AO 72A
(Rev.8/82)

were entitled to qualified immunity); <u>Ahmad v. Furlong</u>, 435 F.3d 1196, 1204 (10th Cir. 2006) (discussing the availability of qualified immunity defense to RLUIPA individual-capacity claim but not explicitly addressing availability of damages).

Other courts, however, have been left unpersuaded that RLUIPA's definition of "government," by itself, indicates Congress' intent to provide for individual-capacity damages claims under RLUIPA.  In <u>Smith v. Haley</u>, 401 F. Supp. 2d 1240, 1246 (M.D. Ala. 2005), for example, the court rejected this contention, concluding instead that RLUIPA's language concerning a "person acting under color of State law" merely indicated that a "government" could be held to account (in equity) for the acts of its officials under a *respondeat superior* theory.  It explained:

> [B]ecause the term at issue is "government," the definitional words "official" and "other person acting under color of State law" could be reasonably read, and understood, to make clear that such person's actions would make the government for which he worked liable under RLUIPA, and thus the words could be read to mean that such person could be sued in his official, and not necessarily individual, capacity.  Because there is simply nothing in the statute that clearly suggests that government employees can be liable for damages in their

16

> individual capacities, the court doubts that RLUIPA
> provides for such.

Id.

And other courts rejecting individual capacity claims under RLUIPA have emphasized that RLUIPA's provision for "appropriate relief" does not explicitly authorize a money damages remedy.  See, e.g., Boles v. Neet, 402 F. Supp. 2d 1237, 1241 (D. Colo. 2005) (finding plaintiff's damages claims under RLUIPA barred and stating that "it does not appear that the statute permits a claim for damages"); cf. Gooden v. Crain, 405 F. Supp. 2d 714, 723-24 (E.D. Tex. 2005) (initially stating that "RLUIPA does not contemplate recovering damages from individuals," but noting a lack of clarity on the issue and concluding that defendants, in any event, had qualified immunity); Chase v. City of Portsmouth, No. Civ. A. 2:05CF446, 2005 WL 3079065, at *5 (E.D. Va. Nov. 16, 2005) (stating that "appropriate relief" under RLUIPA "may include injunctive and declaratory relief as well as nominal damages," but not discussing whether RLUIPA also authorizes compensatory damages); Farrow v. Stanley, No. Civ.02-567-PB, 2005 WL 2671541, at *11 n.13 (D.N.H. Oct. 20, 2005) (noting "substantial uncertainty. . . as to whether [RLUIPA] even

provides a right to money damages," but declining to address issue because it had not been briefed by parties).

While RLUIPA shares its "under color of" language with § 1983, it is also distinct from § 1983 in one significant respect. Unlike RLUIPA, § 1983 explicitly provides for an award of monetary relief. See 42 U.S.C. § 1983 (providing that persons "shall be liable to the party injured *in an action at law*, suit in equity, or other proper proceeding for redress . . . .") (emphasis added). Absent explicit authorization, some courts have reasoned, it is far from clear that Congress intended RLUIPA to provide a legal remedy. See, e.g., Boles, 402 F. Supp. 2d at 1241; cf. Madison v. Virginia, __ F.3d __, 2006 WL 3823181, at *9-10 (4th Cir. Dec. 29, 2006) (concluding that, while states waive sovereign immunity for purposes of RLUIPA claims for equitable relief, the ambiguity presented by the terms "appropriate relief" forecloses claim that states have also waived sovereign immunity from suits for damages).

In view of both the uncertainty of RLUIPA jurisprudence and the absence of explicit authorization in RLUIPA for individual damages actions, the Court concludes that RLUIPA is susceptible of at least two "plausible statutory constructions." See Clark, 543 U.S. at 380-81. On the one hand, RLUIPA may

be, and indeed has been reasonably construed to provide for individual damages actions against prison officials in their individual capacities.  See, e.g., Shidler, 409 F. Supp. 2d at 1067.  But as other courts have held, it may also be reasonably read to foreclose such actions.  See, e.g., Boles, 402 F. Supp. 2d at 1241.  And yet another "fairly possible" reading of RLUIPA is that, while individual capacity actions may be technically authorized under RLUIPA, the only "appropriate" remedy available in such actions is injunctive or declaratory relief.  Cf. Lovelace, 472 F.3d at 196-99 (appearing to recognize, in denying prison official qualified immunity, that RLUIPA authorizes claims against prison officials in their individual capacities, but leaving open question of whether RLUIPA allows award of damages, and noting split among district courts).  Faced with the various plausible interpretations, the Court concludes that RLUIPA is ambiguous on the question of whether it authorizes a private right of action seeking monetary damages against prison officials in their individual capacities.

###   C.   Constitutional Questions Raised by RLUIPA

Having concluded that the provisions of RLUIPA authorizing a private right of action are susceptible of multiple interpretations, the Court turns to

examine whether a construction of RLUIPA authorizing individual damages actions would raise a "serious question" regarding the Act's constitutionality.

It is a bedrock principle of our constitutional system of limited powers that "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."  U.S. v. Morrison, 529 U.S. 598, 607, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000); see also M'Culloch v. Maryland, 4 What. 316, 405, 4 L. Ed. 579 (1819).  The judicial authority to interpret and determine the constitutionality of laws "is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.' "  City of Boerne v. Flores, 521 U.S. 507, 516, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997) (quoting Marbury v. Madison, 1 Cranch 137,176, 5 U.S. 137, 2 L. Ed. 60 (1803)).  Thus, laws enacted by Congress must rest on one of their enumerated or implied powers provided in Article I of the Constitution.  Id.

By providing that RLUIPA applies insofar as a state prison institution "receives Federal financial assistance" or "the substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes," 42 U.S.C. § 2000cc-1(b), Congress explicitly relied on its powers under

20

the Spending and Commerce Clauses of the Constitution in enacting RLUIPA.

The Court considers Congress' authority to enact a damages action against

individuals pursuant to RLUIPA under each of these constitutional provisions.[7]

_____

[7] Congress does not explicitly rely on Congress' Enforcement Power under Section 5 of the Fourteenth Amendment as authority for enacting RLUIPA, and probably for good reason.  In City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997), the Supreme Court held that Congress exceeded its Enforcement Power in enacting a law which, like RLUIPA, imposed greater protection on religious expression than the scope of protection provided by the First Amendment.  Reasoning that "[l]egislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the [Fourteenth Amendment]," the Court ruled that the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488, was unconstitutional.  Id. at 519.  Although RFRA, by purporting to apply to "every agency and official of the Federal, State, and local Governments," was much wider in scope than RLUIPA, much of the reasoning expressed in City of Boerne in striking down RFRA would appear to apply with equal force to Congress' authority to enact RLUIPA under its Enforcement Power.  There, the Court explained:

> RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning.  RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.  It appears, instead, to attempt a substantive change in constitutional protections. Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional.  . . . Remedial legislation under § 5 should be adapted to the mischief and wrong which the Fourteenth Amendment was intended to provide against.

Id. at 532 (citations and quotations omitted).
    Like RFRA, Section 3 of RLUIPA, in effect, seeks "to attempt a substantive

1.      Spending Clause

Article I, Section 8, Clause 1 of the United States Constitution,
commonly referred to as the Spending Clause, provides in pertinent part:
"Congress shall have Power To lay and collect Taxes, Duties, Imposts and
Excises, to pay the Debts and provide for the common Defence and general
Welfare of the United States . . . ."  U.S. CONST. art. I, § 8, cl. 1.  Pursuant to its
spending power, "Congress may attach conditions on the receipt of federal
funds, and has repeatedly employed the power 'to further broad policy
objectives by conditioning receipt of federal moneys upon compliance by the
recipient with federal statutory and administrative directives.' "  South Dakota
v. Dole, 483 U.S. 203, 206, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987) (quoting
Fullilove v. Klutznick, 448 U.S. 448, 474, 100 S. Ct. 2758, 65 L. Ed. 2d 902

---

change in constitutional protections" of prisoners.  See id.  Thus, absent another source
of constitutional authority, Section 3 of RLUIPA would raise a serious constitutional
question if it were enacted only pursuant to Congress' power under Section 5 of the
Fourteenth Amendment.  See Cutter, 423 F.3d at 583 (noting that the concerns raised by
City of Boerne are not present in RLUIPA because, unlike RFRA, it contains "a
Commerce Clause underpinning or a Spending Clause limitation") (quoting Cutter, 544
U.S. at 715); see also Madison v. Riter, 355 F.3d 310, 315 (4th Cir. 2003) ("In passing
RLUIPA, Congress sought to avoid Boerne's constitutional barrier by relying on its
Spending and  Commerce Clause powers, rather than on its remedial powers under
section 5 of the Fourteenth Amendment as it had in RFRA.").

22

(1980)).  Thus, "objectives not thought to be within Article I's 'enumerated legislative fields' may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." Id. (quoting United States v. Butler, 297 U.S. 1, 66, 56 S. Ct. 312, 80 L. Ed. 477 (1936)).

Typically, spending laws make an offer of federal funds to state institutions in return for the state's acceptance of specific conditions.  Thus, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981).  Absent such consent, however, Congress must draw authority to regulate state activity from a different constitutional source.  "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' " Id.

Congress has enacted a number of spending laws, in addition to RLUIPA, which condition the award of federal funding on the funding recipient's willingness to subject itself to private rights of action seeking to enforce the conditions imposed by the legislation.  For example, individuals may bring suits

23

alleging race discrimination against state institutions under Title VI, 20 U.S.C. § 1681 et seq., and may bring suits alleging sex discrimination under Title IX, 20 U.S.C. § 1681 et seq., because both laws create a spending contract that conditions the award of funding on a state's waiver of sovereign immunity to individual suits.  See Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 74-75, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992) (concluding that Spending Power authorized Congress to create private right of action against state institution for intentional Title IX violation); Gebser v. Lago Vista Independent School Dist., 524 U.S. 274, 287, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998) (stating that Title VI and Title IX "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds").  A similar private right of action against state governmental institutions has been recognized under § 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq., which was also enacted pursuant to Congress' spending power.  See Consol. Rail Corp. v. Darrone, 465 U.S. 624, 104 S. Ct. 1248, 79 L. Ed. 2d 568 (1984); see also Barnes v. Gorman, 536 U.S. 181, 190 n.4, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002) (stating that the Rehabilitation

Act "*is* Spending Clause legislation" (emphasis in original)). It is therefore well within Congress' spending power to require state institutions, as a condition of accepting federal funding, to be subject to private liability for breaching the terms of the funding contact.

What is much less clear, however, is whether Congress may act pursuant to its spending power to authorize suits against *private individuals*—who are not parties to a federal funding contract—for violating the conditions imposed by spending legislation.  To the contrary, the current understanding of Congress' spending power is at odds with the notion that Congress can regulate vis-á-vis pending legislation non-parties to a Congressional funding arrangement.

Demonstrating the limited reach of spending legislation, the Supreme Court has recognized on a number of occasions that non-recipients of federal funding, including state officials acting in their individual capacities, may not be subject to private liability under spending clause legislation.  For example, in U.S. Dept. of Transp. v. Paralyzed Veterans of America, 477 U.S. 597, 605, 106 S. Ct. 2705, 91 L. Ed. 2d 494 (1986), the Supreme Court held that the obligations of § 504 of the Rehabilitation Act could not be applied to private airlines because they did not "actually receive federal financial assistance," and

thus were not reached by the statute.  While the Court relied on the text of the statute rather than on the limitations of Congress' spending power, it emphasized the contractual nature of the agreement, and noted that only "the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision."  Id.

Similarly, in NCAA v. Smith, 525 U.S. 459, 468-69, 119 S. Ct. 924, 142 L. Ed. 2d 929 (1999), the Court held that the NCAA was not subject to liability under Title IX because it was a private entity that did not receive financial assistance.  As in Paralyzed Veterans, the Court also relied on a plain reading of Title IX.  In refusing to impose federal conditions on non-recipients of federal funding, however, both NCAA and Paralyzed Veterans reveal the structural—and necessarily constitutional—restrictions on Congress' spending power.  That is, those who do not receive federal funds, and who are not part of a federal funding contract, may not be regulated pursuant to spending legislation.  See also Gebser, 524 U.S. at 292 (acknowledging that no individual capacity action could lie under Title IX against school teacher, but that "[o]ur decision does not affect any right of recovery that an individual may have

26

against a school district as a matter of state law or against the teacher in his

individual capacity under state law or under 42 U.S.C. § 1983").

The circuit courts of appeal have been more explicit in their reliance on

the limitations of the Spending Clause in declining to recognize individual-

capacity suits under spending legislation.  Addressing one such claim under

Title IX, the Eleventh Circuit, in Floyd v. Waiters, 133 F.3d 786, 789 (11th Cir.

1998), vacated on other grounds, 525 U.S. 802, 119 S. Ct. 33, 142 L. Ed. 2d 25

(1998), reinstated, 171 F.3d 1264 (11th Cir. 1999), ruled that state officials

could not be held individually liable under Title IX "because the contracting

party is the grant-receiving local school district . . . and not an individual."  Id.

(quoting Smith v. Metro. Sch. Dist. Perry Township, 128 F.3d 1014, 1019 (7th

Cir. 1997)).  Congress, the court reasoned, "intended Title IX to be a typical

spending clause provision," and thus its conditions applied only to the

recipients of federal funding.  Id. (quoting Davis v. Monroe County Bd. of

Educ., 120 F.3d 1390, 1397 (11th Cir. 1997) (en banc)); see also Hartley v.

Parnell, 193 F.3d 1263, 1270 (11th Cir. 1999) ("Individual school officials . . .

may not be held liable under Title IX.").  In a more recent case, the Fourth

Circuit also relied on the Spending Clause in reaching the same conclusion.  See

27

Jennings v. Univ. of North Carolina, 444 F.3d 255, 268 n.9 (4th Cir. 2006)

("Title IX was enacted pursuant to Congress' spending power and prohibits

discriminatory acts by funding recipients.  Because school officials are not

funding recipients under Title IX, school officials may not be sued in their

individual capacities under Title IX.").[8]  Courts have rejected similar claims

brought under the ADA and Rehabilitation Act against state officials in their

individual capacities on spending-related grounds.  See Lollar v. Baker, 196

F.3d 603, 608-09 (5th Cir. 1999) (holding that a state official could not be

subject to suit in individual capacity under the Rehabilitation Act because she

was not a funding recipient); see also Holbrook v. City of Alpharetta, 112 F.3d

---

[8] It appears that the circuit courts of appeals are in agreement that Title IX, because of its nature as spending legislation and its plain text, does not authorize suits against public officials in their individual capacities.  See Rowinksy v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1012-13 (5th Cir. 1996) (concluding that Title IX only created cause of action for acts of grant recipients because, "[a]s an exercise of Congress's spending power, title IX makes funds available to a recipient in return for the recipient's adherence to the conditions of the grant," and "[t]he fact that Title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients"); Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 (1st Cir. 1988) ("In implying a cause of action under Title IX, the Supreme Court has considered only actions against the educational institution itself.  Accordingly, the separate liability of the supervisory officials at the University must be established, if at all, under section 1983, rather than under Title IX."); Kinman v. Omaha Public School Dist., 171 F.3d 607, 611 (8th Cir. 1999) (agreeing that "Title IX will not support an action against [a state official] in her individual capacity").

1522, 1531 (11th Cir. 1997) (no individual-capacity claims under ADA or

Rehabilitation Act); Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002)

(same); Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 107 (2d

Cir.2001) (same); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th

Cir.1999) (same).

　　　　Like Title VI, Title IX, the ADA, and the Rehabilitation Act, RLUIPA

also invokes Congress' authority under the Spending Clause.   See 42 U.S.C. §

2000cc-1 (b) (applying to any state prison institution which "receives Federal

financial assistance"); Benning v. Georgia, 391 F.3d 1299, 1305-06 (11th Cir.

2004) (holding RLUIPA a valid exercise of Congress' spending power).  It is

thus "much in the nature of a contract," and its "legitimacy . . . rests on whether

the State voluntarily and knowingly accepts the terms of the 'contract.'"

Pennhurst State School, 451 U.S. at 18.  Consistent with this rationale,

RLUIPA has been properly construed to authorize suits against funding

recipients—namely, prisons institutions and their official

representatives—because, by accepting federal funds, these funding recipients

agree to be bound by the obligations imposed by RLUIPA.  But the Court

29

questions whether similar obligations could be imposed on private, non-party individuals to the funding arrangement.

Construing RLUIPA to provide for damages actions against individuals would raise a serious question as to whether Congress has exceeded its powers under the Spending Clause.  By imposing liability on non-recipients of federal funding—individuals who are in essence involuntary and unknowing third parties to the funding contract—RLUIPA would become an example of an unprecedented and untested exercise of Congress' spending power.  There appears to be no historical basis (outside of the recent RLUIPA context) for recognizing individual-capacity damages claims under spending legislation.[9]  It

_____

[9] The Supreme Court has, however, recognized that the Necessary and Proper Clause contained in Article I, § 8, ¶ 18 extends the reach of the Spending Clause to authorize federal criminal laws which "keep a watchful eye on expenditures and on the reliability of those who use public money."  See Sabri v. United States, 541 U.S. 600, 124 S. Ct. 1941, 158 L. Ed. 2d 891 (2004).  Thus, in Sabri, the Supreme Court upheld against Spending Clause challenge the federal bribery statute, 18 U.S.C. § 666(c)(2), which criminalizes bribery of state and local officials of agencies which accept federal funding.  Id. at 610.  Noting that Congress had enacted the statute "to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," the Court held that Congress properly acted within the ambit of the Necessary and Proper Clause to "bring federal power to bear directly on individuals who convert public spending into unearned private gain."  Id. at 607-08 (citations and quotations omitted).

Unlike the federal bribery statute, however, Section 3 of RLUIPA does not seek to impose direct liability on those who unlawfully convert federal funds or who jeopardize the integrity of federal spending.   Rather, a right of action against an

would likewise create significant tension with the Supreme Court's contract-based understanding of Congress' spending power.  As such, the Court concludes that, insofar as it relies on the spending power, a construction of RLUIPA providing for individual liability would raise substantial constitutional concerns, and thus, absent justification in an additional source of constitutional authority, an alternative construction is favored.

   2. <u>Commerce Clause</u>

  Having concluded that construing RLUIPA to authorize damages actions against individuals would raise substantial constitutional concerns under the Spending Clause, the Court turns to examine whether such a construction would raise similar concerns under the Commerce Clause.  The Court concludes that it would.

  In addition to the Spending Clause, RLUIPA expressly invokes the Commerce Clause as a source of constitutional authority.  <u>See</u> 42 U.S.C. §

---

individual under RLUIPA—while arguably justified  as an attempt to ensure the proper spending of federal monies—bears a less direct connection to keeping a "watchful eye" over expenditures and public officials than an outright ban on bribery.  Accordingly, at the very least, a question is raised regarding whether the imposition of private liability to enforce Section 3 of RLUIPA is "bound up with congressional authority to spend in the first place" such that it is consistent with the Necessary and Proper Clause.  <u>See</u> <u>id.</u> at 608.

AO 72A
(Rev.8/82)

2000cc-1(b) (RLUIPA applies insofar as "the substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes").  Because most courts have upheld RLUIPA on spending clause grounds, it appears that no court of appeals has yet addressed whether Section 3 of RLUIPA is a valid exercise of Congress' commerce power.  See Benning, 391 F.3d at 1304 (upholding RLUIPA, as applied to state governments, as valid exercise of Congress' spending power, but declining to reach question of whether RLUIPA is valid exercise of commerce power); Madison v. Virginia, __ F.3d __, 2006 WL 3823181 (4th Cir. Dec. 29, 2006) (same); Cutter, 423 F.3d at 584 (same); Mayweathers v. Newland, 314 F.3d 1062, 1068 n.2 (9th Cir. 2002) (same).  But cf. Charles v. Verhagen, 348 F.3d 601, 609 & n.3 (7th Cir. 2003) (same, but noting as an aside that Wisconsin prison facility sends approximately 4,000 inmates to out-of-state facilities because of overcrowding and thus "certainly engages in interstate commerce to properly handle the requests for religious and other personal property from inmates housed outside Wisconsin").

Article I, Section 8 of the Constitution provides that Congress has authority "To regulate Commerce with foreign Nations, and among the several

AO 72A
(Rev.8/82)

States, and with the Indian Tribes."  The Supreme Court has recognized three

categories of activity that Congress may regulate under its commerce power.

Morrison, 529 U.S. at 608-09 (quoting United States v. Lopez, 514 U.S. 549,

115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)).

> First, Congress may regulate the use of the channels
> of interstate commerce. Second, Congress is
> empowered to regulate and protect the
> instrumentalities of interstate commerce, or persons or
> things in interstate commerce, even though the threat
> may come only from intrastate activities.  Finally,
> Congress' commerce authority includes the power to
> regulate those activities having a substantial relation
> to interstate commerce,  i.e., those activities that
> substantially affect interstate commerce.

Id. (citations and quotations omitted).

RLUIPA does not regulate the "channels" or "instrumentalities" of

interstate commerce.  Rather, it relies only on the third, "affecting-commerce"

rationale of Congress' commerce power.  See 42 U.S.C. § 2000cc-1(b)

(providing that RLUIPA applies insofar as a "substantial burden [on religious

activity] *affects*, or removal of that substantial burden *would affect*,  . . .

commerce . . . among the several states") (emphasis added).

AO 72A
(Rev.8/82)

The Supreme Court has, in a recent trilogy of cases, clarified the boundaries of the "affecting commerce" category of the Commerce Power.  See Lopez, 514 U.S. at 549; Morrison, 529 U.S. at 608; Gonzales v. Raich, 545 U.S. 1, 17, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005); see also generally DAN T. COENEN, CONSTITUTIONAL LAW:  THE COMMERCE CLAUSE 64, 101-05 (2004) (providing overview of "affecting-commerce" category of Commerce Clause jurisprudence).  In Lopez, the Court struck down the Gun-Free School Zones Act, a Congressional ban on the possession of firearms within a short distance of schools, finding that it "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however, broadly one might define those terms," and thus, could not be said to "affect" interstate commerce.  Lopez, 514 U.S. at 561.

The Court revisited the affecting-commerce rationale in Morrison, 529 U.S. at 619-20, in which it struck down the Violence Against Women Act ("VAWA"), which provided a private right of action to victims of gender-motivated violence.  Finding that "the noneconomic, criminal nature" of the regulated conduct was "central" to its previous decision in Lopez, the Court held the conduct regulated by the VAWA was similarly noneconomic, and thus

34

did not substantially affect interstate commerce.  Id.  As it did in Lopez, the

Court refused to consider the aggregate effects of gender-motivated violence on

interstate commerce to find support for the VAWA under the Commerce

Clause.  Id. at 617.

But in Raich, the Court upheld the application of the Control Substances

Act to concededly non-economic conduct in the face of a Commerce Clause

challenge by private growers and users of marijuana.  545 U.S. at 18.  There,

the Court concluded that "Congress can regulate purely intrastate activity that is

not itself 'commercial,' in that it is not produced for sale, if it concludes that

failure to regulate that class of activity would undercut the regulation of the

interstate market in that commodity."  Id. at 18 (citing Wickard v. Filburn, 317

U.S. 111, 127-28, 63 S. Ct. 82, 87 L. Ed. 122 (1942)).  Thus, where Congress

has a "rational basis" to regulate intrastate activity as "an essential part of a

larger regulation of economic activity, in which the regulatory scheme could be

undercut unless the intrastate activity were regulated," even where the regulated

activity is concededly non-economic, the law may pass Commerce Clause

muster.  Id. at 22, 24.

These cases have confirmed several propositions about the boundaries of Congress' Commerce power.  First, any intrastate activity that Congress seeks to regulate must be "economic" in nature in order to be aggregated for purposes of determining its effect on interstate commerce.  See Morrison, 529 U.S. at 613 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). Secondly, noneconomic intrastate activity, which itself does not substantially affect interstate commerce, may nonetheless be the subject of a valid regulation if it is a part of a larger, more comprehensive scheme of commercial regulation. See United States v. Evans, __ F.3d __, 2007 WL 218731 (11th Cir. Jan. 30, 2007) (citing Raich, 545 U.S. at 9) (stating that Raich confirmed that Congress has "substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity").  And finally, noneconomic intrastate activity which is not regulated as a part of a greater scheme of comprehensive commercial regulation cannot be regulated under Congress' Commerce Power unless Congress has a "rational basis" for concluding that it alone "substantially affects" interstate commerce.  See Raich, 545 U.S. at 22;

36

United States v. Rodia, 194 F.3d 465, 472-73 (3d Cir. 1999) (stating that, in considering a facial commerce clause challenge, the focus is on "whether Congress had a rational basis for believing that [regulated activity] has a substantial effect on interstate commerce"); United States v. Ballinger, 395 F.3d 1218, 1226 (11th Cir. 2005) ("Congress' power to regulate activities that 'affect' commerce enables it to reach wholly intrastate conduct-that is, conduct that utilizes neither the channels nor the instrumentalities of interstate commerce-but only when it has 'a substantial relation to' (meaning it 'substantially affect[s]') interstate commerce."); United States v. Patton, 451 F.3d 615, 633-34 (10th Cir. 2006) ("Given that Mr. Patton's possession was not interstate, not commercial, and not an essential part of a comprehensive scheme of economic regulation, that his use of the bulletproof vest was in self-defense and not connected to crimes that might affect interstate commerce, and . . . that the statute would be applied fewer than ten times a year, we find no rational basis for concluding that the possession of body armor prohibited by section 931 substantially affects interstate commerce."); United States v. Maxwell, 446 F.3d 1210, 1216 n.6 (11th Cir. 2006) (noting that Morrison/Lopez factors apply to a "single-subject statute whose single subject itself is non-economic" despite

"potential confusion that may arise from the now unclear status . . . post-
Raich"); cf. United States v. Forrest, 429 F.3d 73, 78 (4th Cir. 2005) ("[T]he
Commerce Clause empowers Congress to regulate purely local intrastate
activities, *so long as* they are part of an 'economic class of activities that have a
substantial effect on interstate commerce.'" (citing Raich, 545 U.S. at 18));
Ballinger, 395 F.3d at 1226 (Birch, J., dissenting) (stating that the Supreme
Court's decisions in Lopez and Morrison recognize that "federal regulation of
intrastate activity must regulate activity that is *economic* in nature") (emphasis
in original).

Having examined the limits of Congress's commerce power, the Court
turns to examine whether Section 3 of RLUIPA, if construed to provide for a
private right of action for monetary damages against officials in their individual
capacities, would raise a substantial question as to whether Congress exceeded
its power under the Commerce Clause.

As an initial matter, the Court questions whether the activity regulated by
RLUIPA is economic in nature, such that it could be considered in the
aggregate for purposes of determining its effect on interstate commerce.
RLUIPA prohibits prison officials from unjustifiably interfering with the

religious practices of institutionalized persons.   To the extent that it were

construed to create a private right of action against individuals, RLUIPA would

restrict private interference with religious activity (under the color of state law,

to be sure), and like the statute struck down in Morrison, entitle private

individuals to seek redress for injuries caused by that conduct.  Although the

Court need not, and does not decide whether the conduct regulated by RLUIPA

is "economic" under the Commerce Clause—or is conceivably so[10]— it is

---

[10] One might conceive of a situation in which the conduct regulated by RLUIPA could be characterized as "economic" in nature.  For example, an affirmative obligation imposed by RLUIPA, such as requiring prison officials to make an accommodation to prisoners with religious dietary requests, could be potentially viewed as compelling an "economic" activity—*i.e.*, the purchasing of specialty foods.  Or, more pertinent to the present case, a restriction on the mailing of a religious publication may arguably be characterized as "economic," by restricting or giving effect to an interstate transaction in religious material. Or, viewing the prison system with a wider lens, the interstate transfer of prisoners and their religious belongings may be viewed as affecting the "articles" of interstate commerce.  See Charles, 348 F.3d at 609 & n.3 (noting, after declining to address RLUIPA's constitutionality under the Commerce Clause, that the Wisconsin prison facility at issue in that case "sen[t]  approximately 4,000 inmates to out-of-state facilities" because of overcrowding and thus "certainly engage[d] in interstate commerce to properly handle the requests for religious and other personal property from inmates housed outside Wisconsin").

But the Court in Morrison did not hypothesize about conceivable situations in which the Violence Against Women Act could be applied to gender-motivated violence which substantially affected interstate commerce, or to violence that occurred simultaneous to or concomitant with interstate travel.  And the Court declined to view effects of the activity in the aggregate through a national lens.  See 529 U.S. at 615 (rejecting "a method of reasoning that . . . seeks to follow the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce").  Rather, the Court focused its inquiry on the nature of the activity directly

enough for purposes of the Court's present analysis that a substantial question exists whether RLUIPA "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however, broadly one might define those terms." See Lopez, 514 U.S. at 561.

Second, RLUIPA does not appear to regulate activity as "a part of an economic 'class of activities' that have a substantial effect on interstate commerce," such that it could be justified by the comprehensive-scheme rationale of Raich.  545 U.S. at 17.  Indeed, RLUIPA stands alone—enacted out of concern for the protection of religious expression on federal land and in prison institutions—and not as part of a greater scheme to regulate the sale of a commercial good or service.

Third, the Court questions whether RLUIPA—if it cannot be justified as an "economic" regulation or as an incidental regulation of intrastate non-economic behavior that is a part of a greater scheme to regulate economic conduct—regulates activity that *alone* substantially affects interstate commerce.

---

regulated by the statute, and on whether Congress had a rational basis for concluding the activity had a substantial effect on interstate commerce.

Thus, in light of the rationale of Morrison, this Court concludes—under the limited inquiry required by the constitutional avoidance rule—that a substantial question is raised regarding whether RLUIPA, if construed to provide a right of action against state officials in their individual capacities, regulates "economic" activity.

AO 72A
(Rev.8/82)

To withstand scrutiny under this prong of the Commerce Clause analysis,

Congress must have had a rational basis for concluding that the individual

behavior regulated by RLUIPA alone substantially affects interstate commerce.

For the reasons expressed above, the Court concludes that a substantial question

would be raised regarding whether Congress had such a rational basis, if

RLUIPA were construed to create a private right of action against individuals

for money damages.  Cf. Cutter, 544 U.S. at 715 (noting that Court invalidated

RFRA in City of Boerne because it "notably lacked a Commerce Clause

underpinning").

　　　Unlike the statutes at issue in Morrison and Lopez, however, RLUIPA

contains a jurisdictional element or "hook," which purports to limit the scope of

RLUIPA's applicability to the outer bounds of Congress' Commerce Power.

See 42 U.S.C. § 2000cc-1 (b) (RLUIPA applies insofar as "the substantial

burden would affect, commerce with foreign nations, among the several States,

or with Indian tribes").  Seizing on this purported limitation, two courts have

suggested in dicta that any application of RLUIPA vis-á-vis Congress'

Commerce Power would, by definition, be within constitutional bounds.  See

Cutter, 412 F.3d at 582 (stating "if the only jurisdictional basis is the Commerce

41

Clause, RLUIPA offers state officials the option of proving, as an affirmative

defense, that the substantial burden on religious exercise—or the removal

thereof—would not in the aggregate substantially affect interstate or foreign

commerce."); Mayweathers v. Terhune, No. CIVS961582LKKGGHP, 2001

WL 804140, at *8 (E.D. Cal. Jul. 2, 2001) (upholding RLUIPA against

Commerce Clause challenge and stating that "[t]he jurisdictional element in §

3(b)(2) thereby ensures that Congress' Commerce Clause power is only

exercised in those cases where interstate commerce is directly affected by the

prison regulation at issue"), aff'd on other grounds by Mayweathers v.

Newland, 314 F.3d 1062, 1068 n.2 (9th Cir. 2002) (declining to reach question

of Congress' authority under Commerce Clause to enact Section 3 of RLUIPA

after concluding Congress had authority under Spending Clause).

These cases, however, in the Court's view, do not resolve all doubts

concerning RLUIPA's constitutionality under the Commerce Clause. Although

the presence of a jurisdictional hook favors a finding of constitutionality, see

Lopez, 514 U.S. at 549 (noting the absence of a jurisdictional hook in striking

down Gun-Free School Zones Act); Morrison, 529 U.S. at 608 (noting same in

striking down VAWA), it does not immunize Commerce Clause legislation

42

from judicial scrutiny.  United States v. Peters, 403 F.3d 1263, 1273 (11th Cir.

2005) (stating that presence of jurisdictional element is not dispositive); see also

United States v. Patton, 451 F.3d 615, 632 (10th Cir. 2006) ("A jurisdictional

hook is not, however, a talisman that wards off constitutional challenges . . .

.The ultimate inquiry is whether the prohibited activity has a substantial effect

on interstate commerce, and the presence of a jurisdictional hook, though

certainly helpful, is neither necessary nor sufficient.").  Indeed, "where a

jurisdictional element is required, a meaningful one, rather than a pretextual

incantation evoking the phantasm of commerce, must be offered." Maxwell,

446 F.3d at 1217; see also United States v. Corp, 236 F.3d 325, 330-31 (6th Cir.

2001) (same); United States v. Wilson, 73 F.3d 675, 685 (7th Cir. 1995) ("[I]n

Lopez, the Court simply did not state or imply that all criminal statutes must

have such an element, or that all statutes with such an element would be

constitutional, or that any statute without such an element is per se

unconstitutional.").  But cf. United States v. Hoggard, 254 F.3d 744, 746 (8th

Cir. 2001) (appearing to hold that a jurisdictional hook immunizes a statute

from Commerce Clause challenge in sustaining federal child pornography

criminal statute because the "jurisdictional nexus is sufficient to place the

statute beyond constitutional attack").  Despite the inclusion of a jurisdictional

hook in RLUIPA, however, a question remains as to whether, if construed to

create a private right of action against individuals for monetary damages,

Congress had a rational basis for concluding that interference with religious

activity in prison would alone substantially affect interstate commerce.  The

Court therefore remains convinced that a serious question would be raised as to

its constitutionality under the Commerce Clause.

In sum, construing Section 3 of RLUIPA to provide a remedy against

prison officials in their individual capacities would unmoor RLUIPA from its

firm grounding in the Spending Clause, see Cutter, 544 U.S. at 715, and

engender debate about whether it regulates localized, noneconomic conduct that

does not substantially affect interstate commerce.  Such a construction may be

in tension with the Supreme Court's modern understanding of the Commerce

Clause, as expressed in Morrison, and thus raises serious constitutional

concerns.  Accordingly, to avoid such a serious constitutional question, the

Court concludes that Section 3 of RLUIPA does not authorize money damages

actions against prison officials in their individual capacities.

## IV.    Legal Standards Applicable to Plaintiff's ¶ 1983 Action

Having concluded that RLUIPA does not provide Plaintiff a basis to sue Defendants in their individual capacities for monetary damages, Plaintiff's exclusive legal remedy lies in § 1983.  Plaintiff asserts violations of the First and Fourteenth Amendments pursuant to § 1983 against Defendants in their individual capacities.  Before turning to examine Plaintiff's claims, the Court observes several overarching principles that guide its analysis.

### A.    The Turner Analysis

It is well established that prisoners retain constitutional rights within prison walls.  See Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).  Prisoners are afforded protections under the free speech and free exercise provisions of the First Amendment, O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L. Ed. 2d 282 (1987) (citing Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)), and the due process provision of the Fourteenth Amendment.  See Owen v. Willie, 1178 F.3d 1235, 1237 (11th Cir. 1997).  It is equally recognized, however, that "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration."  Thornburgh v. Abbott, 490

U.S. 401, 407, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989) (quoting <u>Turner v.</u>

<u>Safley</u>, 482 U.S. 78, 85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)).  Limitations

on prisoners' exercise of constitutional rights "arise both from the fact of

incarceration and from valid penological objectives—including deterrence of

crime, rehabilitation of prisoners, and institutional security." <u>O'Lone,</u> 482 U.S.

at 348.

 To ensure that an appropriate balance is struck between the protection of

fundamental rights and the deference owed to prison officials, the Supreme

Court has determined that the constitutionality of prison regulations should be

adjudged under a "reasonableness" standard. <u>Id.</u> at 349.  Under this test, a

prison regulation "is valid if it is reasonably related to legitimate penological

interests." <u>Turner</u>, 482 U.S. at 89.   The reasonableness approach "ensures the

ability of corrections officials 'to anticipate security problems and to adopt

innovative solutions to the intractable problems of prison administration, and

avoids unnecessary intrusion of the judiciary into problems particularly ill

suited to 'resolution by decree.' " <u>O'Lone</u>, 482 U.S. at 349-50 (quoting

<u>Procunier v. Martinez</u>, 416 U.S. 396, 412, 94 S. Ct. 1800, 40 L. Ed. 2d 224

(1974)).

In <u>Turner</u>, the Supreme Court provided four factors for courts to consider in determining the reasonableness of a challenged prison policy: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact an accommodation of the asserted right will have on guards and other inmates; (4) and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns.  <u>Turner</u>, 482 U.S. at 89-91.

## B.   Qualified Immunity

Defendants raise qualified immunity as a defense to Plaintiff's individual-capacity claims.  Qualified immunity provides "complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  Its purpose is to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly

47

incompetent or one who is knowingly violating the federal law." <u>Lee v.</u>
<u>Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and
citations omitted).

 Qualified immunity is a question of law for the court. <u>Post v. City of Fort</u>
<u>Lauderdale</u>, 7 F.3d 1552, 1557 (11th Cir. 1993). To be entitled to qualified
immunity, the public official "must first prove that he was acting within the
scope of his discretionary authority when the allegedly wrongful acts occurred."
<u>Lee</u>, 284 F.3d at 1194. The burden then shifts to the plaintiff. <u>Lee</u>, 284 F.3d at
1194. There is a two-part test to determine whether a defendant is entitled to
qualified immunity. First, a court asks " 'whether [the] plaintiff's allegations, if
true, establish a constitutional violation.' " <u>Vinyard</u>, 311 F.3d at 1346 (quoting
<u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).
Where the issue of qualified immunity is presented on summary judgment, the
Court resolves all disputed facts in favor of the plaintiff, and it decides whether
the supposed facts amount to a violation of Plaintiff's constitutional rights.
<u>Purcell</u>, 400 F.3d at 1320 (11th Cir. 2005). Second, after sufficiently stating a
constitutional violation, a court must ask whether the right was "clearly
established." <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.

2d 272 (2001).  A right is clearly established if its contours are "sufficiently

clear that a reasonable official would understand what he is doing violates that

right."  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed.

2d 523 (1987).  The salient question is whether the state of the law at the time

of the alleged violation gave officials "fair warning" that their acts were

unlawful.  Hope, 536 U.S. at 740; Holmes v. Kucynda, 321 F.3d 1069, 1078

(11th Cir. 2003); see also Vinyard, 311 F.3d at 1350-53 (articulating a tripartite

analytical framework for ascertaining whether right is "clearly established").

    While materially similar precedent or "broad statements of principle" can

establish a right with sufficient clarity to deny an officer qualified immunity,

they are not in all instances required to provide officials with the requisite

notice.  See Vinyard, 311 F.3d at 1350-52.  In some cases, "the words of a

federal statute or federal constitutional provision may be so clear and the

conduct so bad that case law is not needed to establish that the conduct cannot

be lawful."  Id. at 1350.

    With these foundational principles in mind, the Court turns to examine

the merits of Plaintiff's claims.

V.     **Plaintiff's Individual Claims**

A.     **Stand-At-Attention Policy (Claim 1)**

In his first allegation, Plaintiff attacks a prison policy requiring him to stand "at attention," stand up, or "lock it up" in the presence of prison officials. Plaintiff contends that requiring him to stand at attention contravenes the First Amendment by compelling him to speak against his religious and political beliefs. Relying on West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943), Plaintiff argues that the GDC's stand-at-attention policy is tantamount to mandating salutation of the American flag, and has no relation to any legitimate penological purpose.

Defendants respond by offering a number of justifications for their stand-at-attention policy. First, Defendants contend that prisoners must remain still during inspections or counts to ensure accurate identification and counting of prisoners. Second, Defendants contend that the stand-at-attention policy is a valid disciplinary procedure tailored to "instill a degree of respect for authority." And finally, Defendants contend that the stand-at-attention policy ensures the safety of prison officials, staff, and visitors who come into close contact with unrestrained prisoners.

Having reviewed the record, the Court concludes that Defendants' stand-at-attention policy is constitutional.  Although Plaintiff may genuinely believe as a matter of faith that obeying an authoritative command to stand up and remain still constitutes an act of worship, Defendants have, in the Court's view, easily met their burden of demonstrating that the policy is reasonably tailored to the demands of prisoner discipline, safety, and identification.  In stark contrast to Barnette, Plaintiff does not allege that he was required to perform a salutation, a bowed head, a bended knee, or any other "form of utterance" that "sign[s] his acceptance of the political ideas it thus bespeaks."  See 319 U.S. at 632-33.  To the contrary, he was required to remain silent and still—and prohibited from such gesturing—to ensure security within the prison.  Applying the first factor to be considered under Turner, the Court finds that the stand-at-attention policy is reasonably related to valid penological goals.

Moreover, the Court finds that the remaining Turner factors singularly favor Defendants.  As to the second factor, Plaintiff had ample alternative means to express his religious and political objections to the stand-at-attention policy and to otherwise express himself religiously.  As to the third factor, it hardly must be said that the impact of allowing prisoners to ignore prison

51

officials' commands to stand at attention would be dreadfully adverse to prison administration.  And finally, there are no obvious alternatives to the stand-at-attention policy which might suggest that it is an "exaggerated response" to prison concerns.   There is no constitutional violation.

Furthermore, the Court in not aware of any authority establishing an inmate's right to ignore a command by a prison official to stand up and remain stationary.  Defendants are therefore entitled to qualified immunity.  Accordingly, insofar as the parties move for summary judgment on Plaintiff's stand-at-attention claim (Claim 1), Defendants' Motion is **GRANTED** and Plaintiff's Motion is **DENIED.**

### B.    Religious Headwear Restrictions (Claim 2)

In his second allegation, Plaintiff claims that he was unlawfully restricted from wearing a kufi, an article of Islamic headwear, which is a religious and spiritual expression of his Muslim faith.  Prior to July 2005, inmates at GDC facilities were prohibited from wearing personal headwear outside of prayer meetings.  Plaintiff claims that this restriction burdened his religious exercise

without valid justification, and thus violated the First Amendment.[11]

Although Defendants now maintain a policy permitting inmates to adorn religious headwear, Defendants defend their previous restriction on several grounds.  First, Defendants contend that headwear is frequently associated with gang identification, and thus headwear restrictions reduce the likelihood of gang violence in prison.  Second, Defendants contend that headwear may partially conceal the identity of certain prisoners and thus make it more difficult to identify prisoners.  Finally, Defendants point out other safety concerns, including the risk that inmates will hide weapons or other contraband underneath their head garments.

The Eleventh Circuit has not yet considered a First Amendment challenge to a prison policy restricting religious headwear.  Nevertheless, other courts have been virtually uniform in upholding no-headwear policies as reasonably related to security, disciplinary, and sanitary concerns.  See, e.g., Portley-El v. Zavaras, 188 F.3d 519, 1999 WL 542631, at *2 (10th Cir. Jul. 27, 1999)

---

[11] Because the Court has concluded that Plaintiff cannot bring a RLUIPA claim for monetary damages, and his RLUIPA claims for declaratory and injunctive relief are moot as the result of Plaintiff's release from prison, the Court has no occasion to consider the lawfulness of the Defendants' headwear restrictions under the more rigorous standard of RLUIPA.

AO 72A
(Rev.8/82)

("Because . . . religious headgear may be used to conceal drugs, weapons, or other contraband, and may spark internal violence among prisoners, the wearing of such headgear poses a potential security threat and restricting its wear is entirely appropriate."); Young v. Lane, 922 F.2d 370, 375-77 (7th Cir. 1991) (sustaining prohibition on wearing religious headwear in prison's general population as reasonably related to the prison's "strong interest in uniform dress regulations" and security); Benjamin v. Coughlin, 905 F.2d 571, 578-79 (2d Cir. 1990) (sustaining prohibition on wearing of Rastafarian crowns); Standing Deer v. Carlson, 831 F.2d 1525, 1528 (9th Cir. 1987) (upholding no-headwear policy as reasonably related to cleanliness, security, and safety); Butler-Bey v. Frey, 811 F.2d 449, 451 (8th Cir. 1987) (rejecting inmate's claim that prohibition on wearing of fez violates First Amendment); Rogers v. Scurr, 676 F.2d 1211 (8th Cir. 1982) (rejecting Muslim inmates' First Amendment challenge to policy forbidding religious headwear in prison's general population); see also Nicholas v. Tucker, 2001 WL 228413 (S.D.N.Y. Mar. 8, 2001), at *2 (finding officer entitled to qualified immunity in claim brought alleging restrictions on inmate's wearing of kufi because "a reasonable officer . . . could have concluded that a weapon or contraband could have been

54

concealed under Nicholas' kufi") <u>vacated on other grounds,</u> 40 Fed. App'x 642,

643 (2d Cir. 2002); <u>cf.</u> <u>United States v. James</u>, 328 F.3d 953, 957 (7th Cir.

2003) (Easterbrook, J.) ("The Constitution does not oblige the government to

accommodate religiously motivated conduct that is forbidden by neutral rules,

and therefore does not entitle anyone to wear religious headgear in places where

rules of general application require all heads to be bare or to be covered in

uniform ways").

In <u>Rogers v. Scurr</u>, for example, the Eight Circuit Court of Appeals

rejected a challenge virtually indistinguishable from the one at issue in the

present case.  There, a Muslim prisoner challenged a prison policy that

permitted prisoners to wear skullcaps only when attending religious

ceremonies.  676 F.2d at 1215.  The district court below held the policy violated

the First Amendment because prison officials could adopt a less restrictive

policy that allowed inmates to wear skullcaps in the prison's general population

subject to reasonable searches.  <u>Id.</u>  The Eight Circuit, however, reversed,

holding that the policy was "substantially warranted by the requirements of

prison safety and order," and was an "eminently reasonable" attempt to restrict

prisoner possession of contraband.  <u>Id.</u> at 1215-16.

Here, Defendants have advanced the same reasons in support of the GDC's previous restrictions on headwear as were cited in Rogers and other cases in upholding no-headwear policies as reasonably related to valid penological interests.  The Court finds those cases persuasive.  It is further convinced by an application of the Turner factors that the regulation at issue does not run afoul of the First Amendment.  First, the GDC's generally applicable restriction on headwear within its prison walls is reasonably related to security and identification.  Second, Plaintiff was allowed to wear a Kufi during religious services, and thus had alternative means to express that aspect of his religious faith.  Third, allowing prisoners to adorn religious headwear may undermine the prison's goals of security and identification, and lead to disciplinary problems within the prison.  And fourth, the no-headwear policy was not an "exaggerated response" to GDC's security-related concerns.

In addition to failing to establish a constitutional violation, Plaintiff does not point the Court's attention to any case handed down by the Supreme Court, Eleventh Circuit Court of Appeals, or Georgia Supreme Court which clearly establishes a right to adorn religious headwear in prison.  Accordingly, the Court concludes that Defendants are entitled to qualified immunity.  Insofar as

the parties move for summary judgment on Plaintiff's kufi-restriction claim
(Claim 2), Defendants' Motion is **GRANTED**, and Plaintiff's Motion is
**DENIED.**

### C.   Content-Based Denial of Mail & Publications (Claims 3, 8)

In his third and eighth allegations, Plaintiff claims that Defendants denied
him approximately 52 books on the basis of content in violation of the First
Amendment.  These books include:   (1) *The Catalog of Catalogs VI;* (2)
*Mathematical Cryptology*; (3)  *Applied Cryptography*; (4) *Using Microsoft
Visual InterDev*; (5)  *C++ How to Program*; (6) *Dubugging C++*; (7) *Night
Movements*; (8) *Inside Kung-Fu*; (9) *Complete Karate*; (10) *Far Beyond
Defensive Tactics*; (11) *SAS Training Manual*; (12) *The Encyclopedia of
Survival Techniques*; (13) *The SAS Guide to Tracking*; (14) *Ninja*: *History and
Tradition*; (15) *Ninja: Power of the Mind*; (16) *Ninja Mind Control*; (16) *Bin
Laden:  The Man Who Declared War on America*; (17) *Revolution by the Book*;
*Different Loving*; (18) *How to Survive the IRS*; (19) *Witchcraft:  A Secret
History*; (20) *Practical Electronics*; (21) *Lip Reading Made Easy*; (22)
*HansWehr Arabic English Dictionary*; (23) *Que Tal?;* (24) *C++ from the
Ground Up*; (25) *Visual Basic from the Ground Up*; (26) *Ditch Medicine*; (27)

*Do it Yourself Medicine*; (28) *The Mammoth Book of Love and Sensuality*; (29) *The Joy of Sex*; (30) *Building Bots*; (31) *Gonzo Gizmos*; (32) *Booby Trap Identification and Response Guide*; (33) *Death Investigator's Handbook and DEA Investigator's Manual*; (34) *Georgia Criminal Trial Practice*; (35) *Georgia Criminal Trial Practice—Forms;* (36) *Georgia Handbook on Criminal Evidence*; (37) *Green's Georgia Law on Evidence;* (38) *Criminal Investigation: Basic Perspectives;* (39) *Law Enforcement Technology 260: Criminal Investigation;* (40) *U.S. Army Special Forces Medical Handbook*; (41) *Military Book Club Emergency Medical Procedures*; (42) *The Tao of Sexuality*; (43) *Ragnar's Guide to the Underground Economy*; (44) *Investing Offshore*; (45) *Electronic Circuits and Secret of an Old-Fashioned Spy*; (46) *The Black Science: Ancient and Modern Techniques of Ninja Mind Control*; (47) *The Kama Sutra*; (48) *Samurai: The World of the Warrior*; (49) *Leadership Lessons of the Navy Seals*; (50) *Experiments in Electronic Devices and Circuits*; (51) three *Fantagraphics* books; and (52) *Guide to Getting it On*.  (See Pl.'s Statement of Material Facts [hereinafter "Pl.'s SMF"] ¶¶ 15-59.)

Defendants do not dispute that they denied Plaintiff these books.  Rather, Defendants argue that Plaintiff has failed to demonstrate that he followed the

proper procedures in requesting the books, and that, in any event, the books were properly denied on procedural grounds or after a review by a publications review panel.  Defendants claim they are therefore entitled to qualified immunity, notwithstanding the reasons for the denial of each individual publication.

Regulations affecting the sending of publications to a prisoner are analyzed under the Turner reasonableness standard.  Thornburgh, 490 U.S. at 413 (citing Turner, 482 U.S. at 89).  Such regulations are valid if they are reasonably related to legitimate penological interests.  Id.  In Thornburgh, the Supreme Court held facially constitutional a federal prison policy authorizing a prison warden to deny prisoners certain publications pursuant to specified guidelines, but remanded the case for consideration of the plaintiffs' individual as-applied challenges to the denial of 46 books.  Id. at 403-04.  The regulations upheld in Thornburgh required the prison warden, in determining whether to exclude a specified publication, to consider whether the challenged publication was "detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity."  Id. at 416 (quoting 28 C.F.R. §§ 540.70(b); 540.71(b)).  The guidelines also provided several criteria for rejection,

including whether the publication "depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices," "depicts, encourages, or describes methods of escape from correctional facilities," "is written in code," "depicts, describes or encourages activities which may lead to the use of physical violence or group disruption," "encourages or instructs in the commission of criminal activity," or is "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." See id. (quoting 28 C.F.R. § 540.71(b)).  The warden could not, however, reject a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant."  Id.   Finding that "considerable deference" should be afforded to "prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world," id. at 408, the Court concluded that the policy was facially constitutional.  Nevertheless, the Court remanded the prisoner's as-applied challenge to the district court to determine whether the warden had validly applied the guidelines to each denial of the 46 publications.  Id. at 419.

Following <u>Thornburgh</u>, lower courts have similarly afforded considerable latitude to decisions by prison officials to exclude certain publications from prisoners on the basis of content.  See <u>McCorkle v. Johnson</u>, 881 F.2d 993, 995 (11th Cir. 1989) (finding content-based restriction on satanic materials withstood First Amendment scrutiny because "[i]t is an informed and measured response to the violence inherent in Satan worship, and to the potential disorder that it might cause within the prison"); <u>Thompson v. Patteson</u>, 985 F.2d 202, 206 (5th Cir. 1993) (upholding prison regulation which prohibited materials that prison officials found would encourage deviate sexual behavior); <u>Amatel v. Reno</u>, 156 F.3d 192, 193 n.1, 195-204 (D.C. Cir. 1998) (upholding ban on distribution of all commercial material that "is sexually explicit or features nudity" as reasonably related to goal of rehabilitation, and stating that "[f]or judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative"); <u>Duamutef v. Hollins</u>, 297 F.3d 108, 112 (2d Cir. 2002) (applying "heightened deference" to prison official's decision to censor a book concerning financial advice and finding no constitutional violation); <u>cf.</u> <u>Abernathy v. Cunningham</u>, 393 F.2d 775, 779 (4th Cir. 1968) (finding a restriction on religious magazines constitutional in light of

61

"considered opinion of the prison authorities that such material . . . would, in this setting, be inflammatory and subversive of discipline").

In Duamutef v. Hollins, for example, a prisoner brought suit claiming a prison official violated the First Amendment by censoring a book providing investment advice, entitled *Blood in the Streets: Investment Profits in a World Gone Mad.* 297 F.3d at 110. In addition to being censored, the publication triggered prison officials to institute a strict mail watch on the plaintiff's mailings for a temporary period. Id. The prisoner challenged the exclusionary decision and the resulting mail watch. The district court, noting that the prison officials had conceded that the publication was a "harmless economics book," concluded that the prison officials had violated the First Amendment and were not entitled to qualified immunity. Id. at 111. On appeal, however, the Second Circuit reversed, ruling that, in light of the plaintiff's disciplinary history and the "paramount importance of exercising caution in matters of prison security," no rational jury could find that the censorship decision and resulting mail watch was not reasonably related to legitimate penological interests. Id. at 113. Significantly, the court endorsed the prison officials' decision to exclude the publication at issue based on its "title alone," explaining:

62

> It is true that the publication that sparked their
> decision to institute the mail watch was a harmless
> economics book.  A title containing the phrase "Blood
> in the Streets," however, could arouse concern in any
> reasonable prison official.  Even if, as the district
> court suggested, a jury could find that a more
> thorough examination of the book would have
> assuaged such concerns, we find that it is generally
> sufficient for a prison official to base a security
> decision on the title alone.  Considering the limited
> resources of prison systems and the intense pressure
> to prevent security problems, we cannot expect more
> of corrections personnel in most circumstances.

Id.

Not all books requested by prisoners, however, may be judged by their

covers.  Where a prison official's denial of a publication is unreasonable, and

the prison official provides no other content-neutral basis for the denial, courts

have found a constitutional violation.  See, e.g., Sutton v. Rasheed, 323 F.3d

236 (3d Cir. 2003) (concluding denial of Nation of Islam religious books was

unconstitutional but defendants were nonetheless entitled to qualified

immunity); McCabe v. Arave, 827 F.2d 634, 638 (9th Cir. 1987) (addressing a

"ban" of Church of Jesus Christ books touting white supremacy from a prison

library and holding "literature advocating racial purity, but not advocating

violence or illegal activity as a means of achieving this goal, and not so racially

inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation"); Brown v. Peyton, 437 F.2d 1228, 1232-33 (4th Cir. 1971) (concluding, in a case challenging denial of several religious magazines that court had previously held could validly be restricted, that a plenary hearing should nevertheless be conducted to determine whether a denial of the current issue of magazine could be justified).

As an initial matter, Plaintiff does not bring a facial challenge to the GDC's publication review procedures.  Rather, Plaintiff individually challenges each of the alleged 52 denials of publications, which span such topics as foreign language education, writing in shorthand, computer programming, criminal law, technological invention, martial arts, military tactics, crime scene investigation, witchcraft, sexual performance, and tax collection.

Defendants do not dispute the list of books that Plaintiff claims were denied, and apparently concede that at least certain publications were denied on the basis of content.  Without providing further detail, however, Defendants contend that any books denied based upon content were not denied "without a review of the books."   (See Defs.' Resp. to Pl.'s Mot. for Summ. J. at 9.)

AO 72A
(Rev.8/82)

Defendants further state that, in any event, "[n]early all of Daker's books and publications denials have entailed procedural errors on his part or his failure to comply with mandatory procedure requirements under the Department of Corrections' SOPs or book quantity infractions." (See id.) But besides denying Plaintiff's allegations generally, Defendants do not provide any evidence or argument regarding each of the alleged 52 denials of publications, or the reasons underlying any denial based on content.[12]   Indeed, in their Response to

---

[12] Defendants have, however, albeit only in their response to Plaintiff's Statement of Material Facts, defended the denial of certain books on the basis of content. For example, Defendants state that the book *Witchcraft: A Secret History* "was denied due to pornographic or nude pictures." (See Defs.' Resp. to Pl.'s SMF ¶ 29.) Plaintiff responds that "[t]he book does not promote nudity but one of the photos in the book depicted an exposed breast." (Pl.'s SMF ¶ 29.) It also appears that Defendants admit that Defendant Donald Harris "confiscated an issue of National Geographic magazine because it depicted some tribal women with their breasts exposed," (see Pl.'s SMF ¶ 33; Defs.' Resp. to Pl.'s SMF ¶ 33), and denied the books *Mammoth Book of Love and Sensuality*, *The Joy of Sex*, *The Tao of Sexology*, and the *Guide to Getting it On* because each "depicted nudity and sexually explicit conduct." (See Pl.'s SMF ¶¶ 40, 45, 55; Defs.' Resp. to Pl.'s SMF ¶¶ 40, 45, 55). Defendants also admit that Defendant Hilton Hall excluded the books *Building Bots* and *Gonzo Gizmos* "because [they] threaten the security of the prison by providing information on how to build weapons." (See Defs.' Resp. to Pl.'s SMF ¶ 47.)

But Defendants' bare assertions in their Response to Plaintiff's Statement of Material Facts, which contain no citations to the record or any grounding in affidavits or other evidence, cannot validate the denials of Plaintiff's publications.   Because Defendants have not attempted in their summary judgment papers to defend—or for that matter, even address—their reasons for denying these publications, and have not discussed their policies for denying materials containing nudity, electronics, or weapons, the Court is unable, on the present record, to resolve the validity of the denial of these books to Plaintiff.

Plaintiff's Statement of Material Facts, Defendants merely "dispute [Plaintiff's] allegations as written," (see, e.g., Defs.' Resp. to Pl.'s SMF [241] at ¶¶ 38-39, 41-44, 46, 54, 55), or respond that certain of Plaintiff's requested materials were "contraband . . . which [Plaintiff] had thirty days to dispose of," (see, e.g., Defs.' Resp. to Pl.'s SMF [241] at ¶¶ 49-51, 53), but provide no record citations to evidence.

A cursory review of the titles of the publications at issue establishes that at least certain of the denied books contain objectionable material that could be constitutionally restricted from prisoners on the basis of "title alone." See Duamutef, 297 F.3d at 110. Neither prison officials nor the Court need to prod the pages of *The SAS Guide to Tracking* or *Booby Trap Identification and Response Guide* to find firm constitutional footing to exclude them from a prisoner's possession. Nonetheless, Defendants have utterly failed to provide the Court with any explanation regarding the reasons for its denials of each of Plaintiff's 52 books. Besides Plaintiff's sworn allegations that these books were denied on the basis of content (and in some cases without notice or an opportunity to appeal), the present record is bereft of factual detail regarding the actual reasons—whether procedural or content-based—underlying Defendants'

decision to deny Plaintiff each of these 52 books.   Rather than addressing

Plaintiff's individual allegations, Defendants argue that Plaintiff has failed to

demonstrate that he properly requested the books at issue and complied with

appropriate procedures.  Although Defendants are correct that the final burden

to prove a constitutional violation is on Plaintiff, Plaintiff has come forward

with evidence in the form of affidavits and grievance forms that the alleged 52

publications were denied on the basis of content.  To be entitled to summary

judgment, Defendants must respond by producing evidence that demonstrates

that each challenged denial was reasonably related to valid penological interests

and comports with the other three <u>Turner</u> factors.[13]  <u>See</u> <u>Thornburgh</u>, 490 U.S.

at 419 (remanding for individual challenges to denials of 49 books); <u>Beard v.</u>

<u>Banks</u>, 126 S. Ct. 2572, 2576, 165 L. Ed. 2d 697 (2006) (plurality) (awarding

summary judgment to prison officials because "prison officials have set forth

adequate legal support for the policy" of denying prisoner publications); <u>id.</u> at

2581 ("<u>Turner</u> requires prison authorities to show more than a formalistic

_____

[13] Local Rule 56.1 also requires that Defendants respond with citations to evidence disputing facts alleged by Plaintiff. <u>See</u> L.R. 7.1.(A)(1) NDGa. ("Every motion presented to the clerk for filing shall be accompanied by a memorandum of law which cites supporting authority.  If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law.").

logical connection between a regulation and a penological objective.); see also Myron v. Terhune, 196 Fed. App'x 601, 604 (9th Cir. 2006) (reversing district court's dismissal of prisoner's First Amendment claims because "the record does not yet contain any justification for the restriction"); cf. Jean v. Nelson, 727 F.2d 957, 983-84 (11th Cir. 1984) (reversing and remanding First Amendment challenge to prison regulations because the "district court will clearly need to hear evidence on these matters to arrive at the proper balance between the government's interest in security and the [plaintiff's] interest in exercising its first amendment rights."). Because the Court finds that the present record provides an insufficient basis to award either party judgment as a matter of law, the Court declines to award summary judgment on this claim until hearing from the parties further.[14]  Accordingly, insofar as they relate to

---

[14] Plaintiff's alleged instances of content-based denials of publications date back to August 1997. It would appear that a number of his claims are barred by the two-year statute of limitations respecting § 1983 claims. Plaintiff filed his case on August 18, 2003. Under Georgia's statute of limitations, claims that arose prior to August 18, 2001 would likely be precluded. See Porter v. Ray, 461 F.3d 1315, 1323 (11th Cir. 2006) (applying Georgia's two-year statute of limitations, O.C.G.A. § 9-3-33, to claims brought under ¶ 1983).

Although Defendants discuss the statute of limitations in their response to Plaintiff's Statement of Material Facts (see Defs.' Response to Pl.'s SMF [241] ¶ 8), Defendants failed to raise the statute of limitations as defense in their summary judgment papers. The Court will nevertheless allow Defendants to raise this issue with the Court at the subsequent hearing, where Plaintiff will be afforded a proper opportunity to

Claims 3 and 8 of Plaintiff's Complaint, Defendants' Motion for Summary

Judgment is **DENIED** and Plaintiff's Motion for Summary Judgment is

**DENIED**.   If appropriate, the Court will allow the parties an opportunity to

renew their motions after holding a hearing on this matter as provided in more

detail below.

> ### D.      Procedural Due Process Claims (Claims 4, 7, 14)

Plaintiff also alleges that Defendants denied him notice and an

opportunity to appeal numerous decisions to deny him mail (Claim 4) and the

list of publications provided above (Claim 7 and 14).

Prisoners are entitled to "minimum procedural safeguards" in the context

of such decisions, see Procunier v. Martinez, 416 U.S. 396, 417, 94 S. Ct. 1800,

40 L. Ed. 2d 224 (1974), overruled on other grounds by Thornburgh, 490 U.S.

at 413-14, and in this Circuit such due process protections entail: "(1)

appropriate notice, (2) a reasonable opportunity to challenge the initial decision,

and (3) an ultimate decision by a disinterested party not privy to the initial

censorship decision."  Guajardo v. Estelle, 580 F.2d 748, 762 n.10 (5th Cir.

---

respond.

69

1978).[15]  Plaintiff argues that, while GDC Operating Procedures ostensibly require notice, an opportunity to appeal, and a determination by a disinterested party, these procedures were not followed at the institutions in which he has been incarcerated.

By previous Order, the Court concluded that Plaintiff was entitled to preliminary injunctive relief on his procedural due process claims.  (See Order of Aug. 15, 2005 at 20.)  The court found that Plaintiff had presented "voluminous evidence," in addition to Defendants' own admissions, that Defendants had not provided him with the requisite procedural due process upon denying him mailings or publications.  (See id.)

Defendants contend that "when books or publications are denied for reasons other than content an inmate is not eligible to appeal its denial to the Publication Review Committee."  Nonetheless, Defendants do not respond directly to Plaintiff's alleged instances of procedural due process infractions, instead stating in sweeping terms that "[n]early all of Daker's books and publications denials have entailed procedural errors on his part or his failure to

_____

[15] The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

comply with mandatory procedure requirements . . . or book quantity infractions."  (See Defs.' Resp. to Pl.'s Mot. for Summ. J. [242-1] at 9.)

For example, Plaintiff contends that on May 28, 2003, Defendant Benton denied Plaintiff mail from Plaintiff's brother which contained a copy of the Post Office rates and fees chart that was downloaded from the internet.  "The material was rejected and destroyed without written notice to Daker, documentation of the rejection . . . and without either Daker or his brother being given an opportunity to appeal."  (See Pl.'s SMF ¶ 27; 23rd Aff. Daker ¶ 27.) While Defendants "dispute as written" Plaintiff's allegation, Defendants offer no specific evidence refuting Plaintiff's allegations, and do not state that proper notice or an opportunity to respond was afforded to Plaintiff.  (See Defs.' Resp. to Pl.'s SMF ¶ 27.)

As another example, Plaintiff claims that on October 26, 2004, two books, *The Ninja* and *Endurance Techniques*, were denied to Plaintiff.  He claims that he was initially denied an opportunity to appeal, but after filing a grievance relating to that denial, Plaintiff was ostensibly given an opportunity to appeal.  Nevertheless, Plaintiff alleges that Defendant Hilton Hall "refused to impound the publication for review by the [Publications Review Committee]."

71

After Plaintiff filed another grievance relating to the denial of an opportunity to appeal, Defendant Steve Benton rejected the appeal, stating "only if the facility cannot determine admissibility is the publication to be impounded for further review by the PRC."  (See Pl.'s SMF ¶ 46.)  Once again, Defendants "dispute these allegations as written," without providing any argument or citation to evidence in the record.  (See Defs.' SMF ¶ 46.)

Furthermore, Defendants admit that in February 2005, Plaintiff received from a publisher the books *Criminal Investigation: Basic Perspectives* and *Law Enforcement Technology' 260 Criminal Investigation*.  Defendants also admit that, after denying Plaintiff these books, Plaintiff was not provided an opportunity to appeal their denial.  While not providing any argument on the issue in their summary judgment papers, Defendants state that the reason provided to Plaintiff for the denial was "the appeals process did not apply because the books were not weekly or monthly publications."  (See Defs.' Resp. to Pl.'s SMF ¶ 52.)

Plaintiff also claims that after Defendants denied three catalogs from *Fantagraphics* Books, he requested to appeal the decision to the Publications Review Committee.  Plaintiff alleges that he was denied the opportunity to

appeal that decision because "it doesn't matter, Capt Jones said you can't have them because they have nudity."  (See Pl.'s SMF ¶ 58.)  After being denied the book *Guide to Getting it On* for similar reasons, Plaintiff again claims being denied an opportunity to appeal, to which Defendant Benton responded, "I don't want to hear it.  You go home next week."  (See id. ¶ 59.)

Having reviewed the record, the Court finds that it provides an insufficient basis to award either party judgment as a matter of law at the present time.  See Myron, 196 Fed App'x at 604 (reversing district court's dismissal of prisoner's First Amendment claims because "the record does not yet contain any justification for the restriction"); Jean, 727 F.2d at 983-84. Plaintiff has asserted numerous instances of denials of opportunities to appeal rejections of mailings and publications by Defendants.  A dispute of material facts remains as to these claims.   Furthermore, the Court finds that the law of Guajardo v. Estelle clearly established the procedural due process requirements of the content-based denial of prisoner mailings and publications.[16]

Accordingly, insofar as they relate to Claims 4, 7, and 14 of Plaintiff's

---

[16] As stated, Defendants argue that the denial of mail or publications for content-neutral reasons does not trigger the procedural protections of Guajardo.  The Court finds that the present record does not provide a basis for the Court to consider this argument. Defendants are free, however, to raise it at the subsequent hearing.

Complaint, Defendants' Motion for Summary Judgment is **DENIED** and

Plaintiff's Motion for Summary Judgment is **DENIED**.[17]  If appropriate, the

---

[17] To the extent that Plaintiff asserts that several of his books were destroyed by
Defendants in violation of the Fourteenth Amendment when Plaintiff was transferred to
other prison institutions, those claims fail as a matter of law.  (See Pl.'s SMF ¶¶ 28
(discussing destruction of *Al-Kutub As-Sitah*, *Index-Cum-Concordance of the Holy
Qur'an*, *The Prisoner's Guide to Survival*; and *Abnormal Psychology*); 91-94; 99-101.)
The Supreme Court has held in two cases that property deprivations by prison officials
do not implicate the Fourteenth Amendment if caused by a negligent act, see Daniels v.
Williams, 474 U.S. 327, 106 S. Ct. 662, 663, 88 L. Ed. 2d 662 (1986), or if caused by an
intentional deprivation by a prison employee where the state has provided a meaningful
post-deprivation remedy for the loss.  Hudson v. Palmer, 468 U.S. 517, 531, 104 S. Ct.
3194, 3202, 82 L. Ed. 2d 393 (1984).  Here, the Georgia Tort Claims Act, see O.C.G.A.
§ 50-21-20 et seq., and Georgia's law of trover and conversion, see O.C.G.A. § 51-10-1
provide a constitutionally adequate remedy to redress the destruction of personal property
by a state officer.  The availability of those remedies precludes Plaintiff's claim that he
was intentionally deprived of his property without due process.  See Grant v. Newsome,
411 S.E.2d 796, 797-98 (Ga. Ct. App. 1991) (finding O.C.G.A. § 51-10-1 and O.C.G.A.
§ 9-11-69 are adequate post-deprivation remedies that preclude prisoner's due process
claim alleging property loss); see also Byrd v. Stewart, 811 F.2d 554, 555 n.1 (finding
that Georgia "has provided an adequate post deprivation remedy when a plaintiff claims
that the state has retained his property without due process of law"); Langbehn v.
Henderson, No. 06-CV-3019-TWT, 2007 WL 30602, at *3 (N.D. Ga. Jan. 2, 2007)
(same); Thompson v. Brogden, No. 7:06-CV-91-HL, 2006 WL 2793160, at *3 (M.D. Ga.
Sep. 26, 2006) (same); Price v. Busbee, No. 5:04-CV-313-CAR, 2006 WL 435670, at *4
(M.D. Ga. Feb. 21, 2006) (concluding that Georgia Tort Claims Act provided adequate
post-deprivation remedy to prisoner and thus precluded claim that theft by officials of a
list of phone numbers and personal mail constituted violation of due process).
Furthermore, by Plaintiff's own allegations, it appears that Plaintiff was afforded an
opportunity to aggrieve the destruction of these books, and "DGC acknowledged the
violation, and the loss of the books, but held that monetary compensation was not
available."  (See Pl.'s SMF ¶ 28.)

Court will allow the parties an opportunity to renew their motions after holding a hearing on this matter as provided in more detail below.

### E.   Challenges to Other Mailing and Publication Restrictions (Claims 6, 10, 11, 12, 13, 15, 16, 17)

Plaintiff challenges various other prison policies he claims were maintained during his incarceration by Defendants in violation of the First and Fourteenth Amendments.  But before turning to the specifics of Plaintiff's allegations, the Court observes several limitations on the scope of its analysis of these claims.

Plaintiff has been released from prison, and his claims for equitable and declaratory relief have become moot.  See McKinnon v. Talladega County, 745 F.2d 1360, 1363 (11th Cir. 1984) ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief.")  Plaintiff is therefore limited to retrospective relief for "alleged past wrongs."  Id. at 1362.  This Court's previous dismissal of Plaintiff's injunctive claims "left only a damages claim based on application of the regulations to plaintiff's particular situation."  Wardell, 470 F.3d at 954.  Plaintiff may not bring a facial challenge to Defendants' prison policies because any interest he had in a court declaration of unconstitutionality has become moot.  See Howard

v. Whitbeck, No. 05-2368, 2007 WL 29179, at *2 (6th Cir. Jan. 5, 2007)

("Because Howard has been released on parole and the Michigan statute does

not apply to parolees, any such declaration or injunction would not make a

difference to Howard's current legal interests.  Accordingly, Howard's appeal is

moot."); Wardell, 470 F.3d at 954.  "Although the complaint suggests a broad

facial attack on the regulations prohibiting gift purchases of subscriptions and

the like, the case has been narrowed substantially due to a mootness

consideration," and is therefore "limited to plaintiff's claim for damages based

on particular instances in which enforcement of the challenged prison

regulations allegedly interfered with his constitutional rights."  Id.

     With this in mind, the Court turns to address Plaintiff's purported

challenges to various GDC prison policies.

          1.     Address Requirements (Claim 6)

     In his sixth allegation, Plaintiff alleges that two letters he sent to other

prisoners were returned to him stamped "returned to sender" in violation of the

First and Fourteenth Amendments.  (See Pl.'s St. of Mat. Facts ¶ 34; 64-67.)

Plaintiff claims that the prisons to which he sent these letters maintained an

unconstitutional policy requiring the name or number of the dormitory in which

a prisoner resided to be included as a part of the address label in order for mail to be delivered to that prisoner.

As stated, Defendant no longer has standing to challenge the facial validity of the mail-labeling requirement.  Rather, he must allege and prove specific instances of the unconstitutional denial of his mailings in order to recover damages on his claims.  In the Court's view, Plaintiff's two allegations concerning returned mail do not rise to the level of colorable constitutional violations, absent evidence that Plaintiff's mailings were denied arbitrarily or on the basis of content.  In addition, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable for money damages.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Plaintiff has not alleged that any of the named Defendants were involved in any decision to reject Plaintiff's mail for failing to address it appropriately.

In any event, Plaintiff has failed to demonstrate the existence of any clearly established right to send another prisoner mail without addressing it specifically by dormitory.[18]  Accordingly, Defendants have qualified immunity

---

[18] Rather, the weight of authority favors upholding non-arbitrary restrictions on inmate-to-inmate communications.  See Vester v. Rogers, 795 F.2d 1179, 1183 (4th Cir. 1986) (upholding prison policy which required permission of warden before allowing prisoners to communicate by mail with prisoners in other institutions as reasonably

and Plaintiff may not recover monetary damages on these claims.  Defendant's

Motion for Summary Judgment on Claim 6 is **GRANTED** and Plaintiff's

Motion is **DENIED**.

        2.      <u>Payment Requirements/Ban on Gift Publications</u> (Claims 10, 11)

In his tenth and eleventh allegations, Plaintiff claims that Defendants

maintain an unconstitutional policy requiring that prisoners pre-pay out of their

own prison accounts for publications they receive by mail from book dealers.

Plaintiff claims that this policy effectively disallows third parties, such as

family members, from paying for publications.  He challenges both the

requirement that publications be pre-paid (Claim 11) and the alleged ban on gift

publications (Claim 10).  Defendants defend their pre-paid requirement as

constitutional and deny that they maintain a ban on gift publications.

As an initial matter, most, if not all, courts have upheld prison policies

requiring that publications received by inmates be prepaid.  <u>See</u> <u>Rodriguez v.</u>

<u>James,</u> 823 F.2d 8, 11-12 (2d Cir. 1987) (upholding prison regulation allowing

---

related to the state's "need to impose a limit on the flow of information between inmates as a means of reducing institutional tensions and impeding the exchange of communication relating to unlawful activity"); <u>Thornburgh,</u> 490 U.S. at 412 (noting that material which circulates within prison walls may has "potential for coordinated disruptive conduct and thus "it is essential that prison officials be given broad discretion to prevent such disorder").

inspection of prisoner's business mail on grounds that inspection was "intended to limit the monetary obligations assumed by inmates and to require that inmates prepay for items ordered by the mail"); see also Lena v. DuBois, No. 93-1924, 1994 WL 99940, at *1 (1st Cir. Mar. 23, 1994) (upholding "rule[ ] barring the receipt of publications, ordered through the mail, that have not been paid for in advance"); Gardner v. Dalimonte, No. M87-211 CA3, 1991 WL 71034, at *8 (W.D. Mich. Jan. 30, 1991) (upholding prison regulation foreclosing prisoners from participating in book-of-the-month clubs or other contract purchases); cf. Mayberry v. Robinson, 427 F. Supp. 297 (M.D. Pa. 1977) (requiring that, before prisoner could obtain publications that had not been prepaid, those publications be addressed to prisoner with correct name, prison number, and words "State Correctional Institution").  They have done so because such restrictions "remove[ ] the inducement for prisoners to defraud mail-order vendors," Gardner, 1991 WL 71034, at *9, and "prevent inmates from . . . obligating funds beyond their means." Lena, 1994 WL 99940, at *1. Defendants' pre-payment requirement passes constitutional muster.  In any event, no case clearly establishes that such a requirement is unconstitutional. As such, Defendants are entitled to qualified immunity on Claim 11.

Courts have been more willing, however, to strike down outright bans on

gift publications, at least in the absence of any superior state interest.  <u>See</u>

<u>Crofton v. Roe</u>, 170 F.3d 957, 960-61 (9th Cir. 1999) (affirming injunction

against no-gift-publications rule because state "has offered no justification for a

blanket ban on the receipt of all gift publications, nor has it described any

particular risk created by prisoners receiving such publications"); <u>Jacklovich v.

Simmons</u>, 392 F.3d 420 (10th Cir. 2004) (reversing district court and

concluding that state, on the present record, had not demonstrated that

publication payment requirement, which effectively banned gift publications,

was reasonably related to state interest in preventing prisoner in-fighting and

managing prisoner behavior, and remanding for trial); <u>Lindell v. O'Donnell</u>,

No. 06-1983, 2006 WL 3228601, at *2 (7th Cir. Nov. 8, 2006) (recognizing that

all-out ban on receiving printed internet materials, including from friends and

family members, would be unconstitutional, but finding defendants entitled to

qualified immunity); <u>cf.</u> <u>Wardell v. Duncan</u>, 470 F.3d 954, 961 (10th Cir. 2006)

(upholding no-gift-publications ban as applied to gifts made by third persons

linked to other inmates because "permitting third-party gifts and then trying to

control the resultant security problems through reactive efforts within the prison

AO 72A
(Rev.8/82)

would pose a burden on staff and resources," and finding <u>Jacklovich</u> and

<u>Crofton</u> inapposite because they "involved broader claims for equitable relief

facially challenging more restrictive regulations than those at issue here").

In their motion papers, Defendants deny the existence of a gift-ban

policy.  In response, Plaintiff points to one occasion in which he claims he was

unconstitutionally subject to such a policy.   Plaintiff states that in December

2003, he was denied four books by Defendants Harris and Jones that were sent

by a publisher "because they were paid by Daker's family rather than by him

off his prison account."  (<u>See</u> Daker Aff. ¶ 36.)  After Plaintiff filed a grievance

relating to this issue, however, Plaintiff admits that "the issue was resolved in

his favor."  (<u>See</u> Pl.'s SMF ¶ 37; Defs.' Resp. to Pl.'s SMF ¶¶ 36-37.)

Although Plaintiff claims that "prison officials did not enforce the grievance

decision and the gift publications ban was still enforced haphazardly and

arbitrarily," Plaintiff does not allege that the four publications that were paid for

by his family were not delivered to Plaintiff after his grievance was granted.

(<u>See</u> Pl.'s SMF ¶ 37.)  Nor does Plaintiff allege any other instance in which he

was actually or effectively denied publications pursuant to the alleged ban on

gift publications.

Having reviewed the record, the Court concludes that Plaintiff has failed to bring forth sufficient facts of the existence of a gift-ban policy.  The only facts underlying Plaintiff's challenge to the alleged no-gift policy concern a temporary withholding of four books that were apparently eventually delivered to Plaintiff as a result of a successful grievance.  Since any initial denial of the four publications gifted by his family was, as Plaintiff concedes, redressed by the prison's administrative procedures, there is no basis in the record to conclude that Defendants were acting pursuant to an unconstitutional ban on gift publications.  Moreover, the Court's review of the "Inmate Property Disposal Agreement" respecting the denial of those books gives no indication that Defendants were acting pursuant to a gift-ban policy.  (See Ex. AG to Pl.'s 23rd Aff. [234-3].)  And in any event, as no Supreme Court, Eleventh Circuit, or Georgia Supreme Court case has yet considered the validity of a gift-publication ban, Defendants are entitled to qualified immunity.   Accordingly, insofar as Defendants seek summary judgment on Claims 10 and 11 in Plaintiff's Complaint, their motion is **GRANTED**.  Insofar as Plaintiff seeks summary judgment on Claim 10 and 11, his motion is **DENIED.**

AO 72A
(Rev.8/82)

3.    <u>Requirements to Request by Specificity</u> (Claims 12, 17)

In Claims 12 and 17, Plaintiff challenges the constitutionality of a GDC policy requiring that prisoners request a publication by name, title, and description in order to receive a publication from a book dealer or book club. Plaintiff claims that this policy is tantamount to "precensorship, in which before a prisoner may receive books, he had to submit a package request form along with the names and description so the requested books [which p]rison officials would then approve or deny . . . based on the titles and descriptions of the books. . . ."  (<u>See</u> Pl.'s SMF ¶ 76.)   In support of these claims, Plaintiff alleges that he was denied approval to take the college correspondence course *Law Enforcement Technology 260: Criminal Investigation* based on Defendants' review of his publication request form.  Plaintiff argues that the First and Fourteenth Amendments mandate that prison officials physically inspect a publication before making an exclusionary decision.  Because the Court concludes, however, that Plaintiff does not have standing to pursue a facial challenge of the publication-request requirement, the Court does not take the occasion to consider its lawfulness here.

AO 72A
(Rev.8/82)

The Court has discussed the limited nature of Plaintiff's standing to pursue a damages claim.  To have standing, a plaintiff must first show that he "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992) (internal quotations and citations omitted).  An injury in fact "cannot be an abstract injury."  Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004).  Rather, a plaintiff "must point to some type of cognizable harm, whether such harm is physical, economic, reputational, contractual, or even aesthetic."  Id.   As the Eleventh Circuit has explained:

> The plaintiff must be directly affected apart from her special interest in the subject.   To be particularized, we mean that the injury must affect the plaintiff in a personal and individual way. If the plaintiff is merely a "concerned bystander," then an injury in fact has not occurred.

Id. (citing Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 473, 102 S. Ct. 752, 759, 70 L. Ed. 2d 700 (1982)) (citations and quotations omitted)

84

While Plaintiff points to an instance in which he claims he was denied a particular publication as a result of the publication-request requirement, it is revealing that Plaintiff challenges the same denial of *Law Enforcement Technology* as a content-based denial in violation of the First Amendment (Claim 3). To prevail on either claim, he must demonstrate that he was entitled to the publication at issue under the First Amendment, and that Defendants' exclusion of the publication was not reasonably related to any legitimate penological goal. The only difference with the present challenge is that Plaintiff seeks a court declaration that the GDC's publication-request policy is facially unconstitutional. As stated, Plaintiff may not, however, challenge the facial validity of the publication-request requirement. Since Plaintiff has failed to demonstrate how, by being subject to the package-request policy, he suffered any concrete and particularized injury separate and apart from the injury he suffered relating to the denial of the same publication—which is redressable through his First-Amendment content-based denial claim (Claim 3)— Plaintiff's challenge of the prison's package-request policy fails as moot. <u>See Wardell</u>, 470 F.3d at 959, 961. Accordingly, insofar as Defendants seeks summary judgment on Claims 12 and 17, their Motion is **GRANTED**. Insofar

85

as Plaintiff seeks summary judgment on Claims 12 and 17, his motion is
**DENIED.**

        4.      <u>Physical Restrictions</u> (Claim 13)

In his thirteenth allegation, Plaintiff challenges a prison policy limiting the size and number of publications he was allowed to possess while incarcerated at GDC facilities.  Plaintiff's facial challenge to GDC's restrictions also fails on standing grounds.  Plaintiff has failed to allege concrete harm that he has suffered as a result of the imposition of the physical restrictions he challenges.  Rather, any publication that was unlawfully denied to Plaintiff in violation of the First or Fourteenth Amendments may be recompensed through his First and Fourteenth Amendment claims.

That Plaintiff cannot facially challenge GDC's physical restrictions does not mean that the "reasonableness" of the physical restrictions on publications policy may not be eventually in contention in this case.  Indeed, should Defendants rely on their physical-restrictions policies in justifying certain procedural denials of Plaintiff's publications, they place the reasonableness of these policies in issue.  Nevertheless, the limited nature of the present damages

AO 72A
(Rev.8/82)

action precludes Plaintiff from facially challenging these physical restrictions.[19]

 Accordingly, insofar as Defendants seek summary judgment on Claim 13, their motion is **GRANTED**.  Insofar as Plaintiff seeks summary judgment on Claim 13, his motion is **DENIED**.

5.      Legal Materials of Other Inmates (Claim 15)

In his fifteenth allegation, Plaintiff challenges a GDC policy restricting prisoners from possessing or receiving the legal materials of other inmates.  He claims that in 2004, while incarcerated at Central State Prison, prison officials rejected several mailings by other prisoners which contained copies of court decisions.  When asked about the reasons for one of the exclusions, Captain Jones "said he denied it because prisoners may not receive legal material of another prisoner."  (See Pl.'s SMF ¶ 87-90.)  Defendants do not dispute that they maintain a policy preventing prisoners from sharing their legal materials.  (See Defs.' Resp. to Pl.'s SMF ¶ 87.)

---

[19] Even if the Court were to entertain Plaintiff's challenge, it is exceedingly doubtful that Plaintiff could prevail.  See Isby v. Wright, 104 F.3d 362 (Table), 1996 WL 735595, at *3 (7th Cir. Dec. 12, 1996) (upholding policy limiting prisoner access to one newspaper at a time in addition to paperback books and magazines); Kines v. Day, 754 F.2d 28, 30 (1st Cir. 1985) (upholding prison policy limiting prisoners from receiving more than one package per month containing books or magazines).

Courts have recognized that restrictions on inmate-to-inmate communications may be reasonably related to preventing communications relating to unlawful activity and maintaining security in general.  See, e.g., Vester v. Rogers, 795 F.2d 1179, 1183 (4th Cir. 1986) (upholding prison policy which required permission of warden before allowing prisoners to communicate by mail with prisoners in other institutions as reasonably related to the state's "need to impose a limit on the flow of information between inmates as a means of reducing institutional tensions and impeding the exchange of communication relating to unlawful activity"); see also Thornburgh, 490 U.S. at 412 (noting that material which circulates within prison walls may has "potential for coordinated disruptive conduct and thus "it is essential that prison officials be given broad discretion to prevent such disorder").  Unfortunately, Defendants' summary judgment papers contain no discussion of the reasonableness of the challenged policy, thus placing the Court in a difficult position to address its constitutionality.  Even assuming such a policy were unconstitutional, however—which the Court doubts—Plaintiff has not pointed the Court to any decision of the Supreme Court, Eleventh Circuit, Georgia Supreme Court, or any other court, for that matter, recognizing that a prisoner has a First

88

Amendment right to another prisoner's legal materials.  As such, the Court

concludes that Defendants are entitled to qualified immunity.  Defendants'

Motion for Summary Judgment, insofar as it seeks judgment as a matter of law

on Claim 15, is therefore **GRANTED**, and Plaintiff's Motion is **DENIED**.

> 6.   <u>Requirement that Printed Material be Sent by Publishers or Attorney</u>  (Claim 16)

In his sixteenth allegation, Plaintiff challenges a GDC policy requiring

that all "printed material or photocopies" be sent by a publisher, dealer, or

established attorney of record.   In support of this allegation, Plaintiff alleges

that Defendant Don Jarriel removed a paper copy of the court case

<u>Mayweathers v. Terhune</u> from a letter sent to Plaintiff by a family member

purportedly because "it was downloaded off the internet" and violated the rule

that such material must come from a publisher or attorney.  Plaintiff was given

a "property disposal form" and a "property inventory form" informing him of

the decision to censor the materials as prohibited material "copied from a

book."  (<u>See</u> Ex. U & V to 23rd Aff. Daker [234-2]; Pl.'s SMF ¶ 29.)

Defendant's respond that they "do not have sufficient information to admit or

deny" this allegation.  (<u>See</u> Defs.' Resp. to Pl.'s SMF ¶ 29.)

As explained above, Plaintiff may not facially challenge the prison policy at issue.  Nonetheless, Plaintiff may have a First Amendment interest in the photocopies and other clippings which he alleges were excluded by prison officials as the result of an overinclusive policy restricting inmates from receiving photocopies or newspaper clippings by mail.  See Allen v. Coughlin, 64 F.3d 77, 80-81 (2d Cir. 1995) (recognizing that there might be a constitution violation where prison officials remove "entirely innocuous" newspaper clippings from prisoner's mail pursuant to publisher-only rule, but finding that officials were entitled to qualified immunity).  Nevertheless, the Eleventh Circuit has never addressed the constitutionality of such a policy, and other courts appear divided on the issue.  Compare id.; Lindell v. Frank, 377 F.3d 655, 660 (7th Cir. 2004) (concluding that publisher-only rule as applied to all newspaper clippings and copies, albeit a "close issue because of the deference prison administrators enjoy," was unconstitutional because of prisoner's "lack of other access to the restricted materials and the less exaggerated responses available to the prison," but finding prison officials were entitled to qualified immunity); Lindell v. O'Donnell, No. 06-1983, 2006 WL 3228601, at *2 (7th Cir. Nov. 8, 2006) (recognizing that all-out ban on receiving printed internet

materials, including from friends and family members, would be

unconstitutional, but finding defendants entitled to qualified immunity) <u>with</u>

<u>Montgomery v. Coughlin</u>, 194 A.D.2d 264 (N.Y. App. Div. 1993) (upholding

publisher-only rule as applied to remove newspaper clippings from prisoner's

mail); <u>Hurd v. Williams</u>, 755 F.2d 306, 308-09 (3d Cir. 1985) (finding that

publisher-only rule that restricted receipt of newspapers, periodicals, and

softbound volumes was reasonably related to government interest in controlling

smuggled contraband and saving staff resources).  <u>Cf.</u> <u>Ward v. Washtenaw City</u>

<u>Sheriff's Dept.</u>, 881 F.2d 325, 329 (6th Cir. 1989) (upholding policy providing

publisher-only rule including newspapers and magazines "as necessary to

control the security problems caused when contraband such as drugs and

weapons are smuggled in various books, magazines, and newspapers to inmates

from unidentified sources or visitors); <u>Thompson v. Campbell</u>, 81 Fed. App'x

563, 569 (6th Cir. 2003) (upholding publisher-only rule regarding books,

magazines, and newspapers); <u>Kines v. Day</u>, 754 F.2d 28, 30 (1st Cir. 1985)

(same).

  The absence of clarity within Georgia or the Eleventh Circuit on this

issue entitles Defendants to qualified immunity.  In view of the current split in

doctrine, no reasonable Georgia prison official should have known that excluding printed material from Plaintiff's mailings violated the First Amendment.  Accordingly, insofar as Defendants seek judgment as a matter of law on Claim 16, their Motion is **GRANTED**.  Plaintiff's is **DENIED.**

### F.     Retaliation (Claim 18)

In his final allegation, Plaintiff contends that Defendants Benton and Jones have retaliated against him for filing this action and for filing grievances relating to this action.  (See PSMF ¶ 102-11.)  For example, Plaintiff claims that on May 5, 2005, he was "shaken down" and his shoes were confiscated as a result of sending legal mail pertaining to this case.  (Id. ¶ 102.)  Plaintiff also claims that his cell was stripped and searched 6 times in three months between June and August 2005.  Finally, Plaintiff claims that Defendants Benton and Jones retaliated against him for refusing to stand up during a cell inspection. Plaintiff alleges that Defendants Benton and Jones placed Plaintiff in a strip cell for a temporary period of time, which effectively denied Plaintiff access to his publications and personal hygiene items.

The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.  Farrow v. West, 320 F.3d

1235, 1248 (11th Cir. 2003).  "To state a first amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right."  Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989).  "The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech."  Id.; see, e.g., Bridges v. Russell, 757 F.2d 1155, 1156 (11th Cir. 1985) (holding that a prisoner stated a claim of retaliation based on being transferred to another facility even though prisoners have no liberty interest in remaining at a particular facility).  Rather, "a prisoner must demonstrate that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.' "  Farrow, 320 F.3d at 1248  (quoting Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989)).

In their summary judgment papers, Defendants limit their defense to Plaintiff's retaliation claims by contending only that Plaintiff failed to file grievances and thus failed to exhaust his administrative remedies relating to these claims.  However, as Plaintiff points out in his response, Plaintiff filed six grievances relating to the actions of Defendants Benton and Jones in July and August 2005, and each was denied outright or administratively closed due to Plaintiff's release from prison in October 2005.  (See Pl.'s Resp. to Defs.' Mot.

93

For Summ. J. [232-1] at 23-24.)  Defendants, in their reply brief, do not contest

Plaintiff's asserted efforts of exhaustion, and appear to abandon their claims

that Plaintiff failed to administratively exhaust his retaliation claim.

Besides relying on their failure-to-exhaust argument, Defendants have

not provided any evidence or argument tending to refute Plaintiff's allegations

of retaliation.  Indeed, in their Response to Plaintiff's Statement of Material

Facts, Defendants simply "dispute these allegations as written," and do not

provide any citations to the record that dispute Plaintiff's sworn testimony.

(See Defs.' Resp. to Pl.'s SMF ¶ 102-111.)

Local Rule 56.1 requires that Defendants respond with citations to

evidence disputing facts alleged by Plaintiff.  L.R. 7.1.(A)(1) NDGa. ("Every

motion presented to the clerk for filing shall be accompanied by a memorandum

of law which cites supporting authority.  If allegations of fact are relied upon,

supporting affidavits must be attached to the memorandum of law.")

Defendants have failed to cite any affidavit or other evidence disputing the

alleged facts, supported by Plaintiff's sworn testimony, that Defendants Benton

and Jones retaliated on a number of occasions against Plaintiff for filing

grievances and claims relating to the issues in this litigation.  Absent such

94

evidence, the Court has no basis upon which to deny Plaintiff's Motion. Powers v. CSX Transp., Inc., 190 F. Supp. 2d 1284, 1286 n. 2 (S.D. Ala. 2002) ("Although such evidence may exist somewhere in the record, it is not the Court's duty to comb the record to attempt to find reasons to deny a motion for summary judgment."). The Court concludes that no dispute of fact exists as to whether Defendants Benton and Jones retaliated in violation of the First Amendment against Plaintiff.[20] Furthermore, the Court finds that the right to be free from retaliation is clearly established and therefore Defendants Benton and Jones are not entitled to qualified immunity. See Thomas, 880 F.2d at 1242. Accordingly, insofar as Plaintiff's Motion for Summary Judgment seeks judgment as a matter of law on the liability aspect of Defendants' retaliation

_____

[20] To the extent that Plaintiff alleges a violation of the Eighth Amendment, however, the Court concludes that Plaintiff's claim fails as a matter of law. Plaintiff has alleged only that he was temporarily placed in a strip cell without personal hygiene materials. He does not specify the length of time in which he was deprived of such materials. At best, Plaintiff alleges a *de minimus* injury that does not rise to the level of the objectively serious injury required to establish an Eighth Amendment violation. See Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2007) (ruling an Eight Amendment violation can be established "only if there is more than *de minimis* injury"); Hilton v. Secretary for Dept. of Corrections, 170 Fed. App'x 600, 604 (11th Cir. 2005) (holding that spitting of tobacco juice in inmate's face was "de minimus" and thus not redressable by claim under the Eighth Amendment); Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). Thus, to the extent that Defendants seek summary judgment on Plaintiff's claim under the Eighth Amendment, their motion is **GRANTED.**

claims, that motion is **GRANTED**.  Insofar as Defendants' seek summary

judgment, their motion is **DENIED**.  The Court will hear further from the

parties on the issue of damages at the subsequent hearing.

## VI.    Hearing on Remaining Issues

As previously discussed, the Court will hear from the parties further on

several issues, which the Court considers may still be amenable to summary

adjudication.  At the time set forth below, the parties shall present evidence and

argument respecting the following issues:  (1) whether each of the

approximately 52 incidents of publication denials by Defendants were

constitutional under the First Amendment pursuant to Turner v. Safley, 482

U.S. 78, 85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); (2) whether each of the

approximately 52 incidents of publication denials were constitutional under the

Fourteenth Amendment pursuant to Guajardo v. Estelle, 580 F.2d 748 (5th Cir.

1978); (3) whether Defendants are entitled to qualified immunity on Plaintiff's

First and/or Fourteenth Amendment claims; (4) whether Plaintiff is entitled to

damages should he establish violations of the First and/or Fourteenth

Amendments, and if so, the amount per violation; and finally, (5) the amount of

damages to which Plaintiff is entitled for succeeding on his retaliation claim.

**Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment [220] is **GRANTED in part and DENIED in part**.  It is granted insofar as Defendants seek judgment as a matter of law on Counts 1, 2, 6, 10, 11, 12, 13, 15, 16, 17, and 19 of Plaintiff's Complaint.  It is denied insofar as Defendants seek judgment as a matter of law on Counts 3, 4, 7, 8, and 14 of Plaintiff's Complaint.

Plaintiff's Motion for Summary Judgment [234] is **GRANTED in part and DENIED in part**.  It is granted insofar as it seeks judgment as a matter of law on the liability aspect of Claim 18 against Defendants Benton and Jones for retaliating against Plaintiff in violation of the First Amendment.  It is denied in all other respects.

Plaintiff's Motion to Amend his Complaint [245] is **GRANTED**.  The Court **DISMISSES** Counts 5 and 9 of Plaintiff's Complaint without prejudice.

The parties are hereby **ORDERED** to appear before the Court on the 13th  day of March, 2007 at  2:30 p.m. , Courtroom 2105, United States Courthouse, 75 Spring Street S.W., Atlanta, Georgia for a hearing on the issues set out above.

AO 72A
(Rev.8/82)

**SO ORDERED** this   26th   day of February, 2007.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE