**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| WASEEM DAKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:03-CV-02481-RWS |
| | : | |
| JOE FERRERO, et al., | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

This case comes before the Court for resolution of Defendants' Motion for Reconsideration [249]; Defendants' Supplemental Motion for Summary Judgment [253]; and Plaintiff's Motion for Summary Judgment [258].  After reviewing the record, the Court enters the following Order.

### Background

This is a civil rights action brought pursuant to 42 U.S.C. § 1983.  By Order dated February 26, 2007 [246], this Court resolved on summary judgment a

1

significant number of Plaintiff's nineteen original claims.[1]  What remain are

Plaintiff's challenges to the following three practices he alleges he was subjected to

during his confinement in Georgia Department of Corrections ("GDC") prison

facilities: (1) the content-based denial of approximately 55 mailed publications and

---

[1] For ease of reference, the Court details below the list of individual challenges Plaintiff brought in his Fourth Amended Complaint.

| | |
|---|---|
| Count 1: | Stand-at-attention requirement |
| Count 2: | Restrictions on wearing a Kufi |
| Count 3: | Content-based denial of mail and publications |
| Count 4: | Denial of procedural due process when mail denied (prisoners) |
| Count 5: | Denial of procedural due process when mail denied (non-prisoners) |
| Count 6: | Requirement that mail be addressed to dormitory |
| Count 7: | Denial of procedural due process when publications denied (prisoners) |
| Count 8: | Content-based denial of foreign language publications |
| Count 9: | Denial of procedural to process when publications restricted (non-prisoners) |
| Count 10: | Denial of gift publications (that are not paid in full by prisoner) |
| Count 11: | Pre-paid Requirement for publications |
| Count 12: | Requirement that Prisoner request book by name, title, and description |
| Count 13: | Restrictions on size and number of publications possessed |
| Count 14: | Seizure of publication without procedural due process |
| Count 15: | Denial of legal materials of other inmates |
| Count 16: | Requirement that printed material be received from publishers or attorney |
| Count 17: | Requirement that specific request be made to receive publications from dealer |
| Count 18: | Retaliation for filing this action and related grievances |
| Count 19: | Denial of Digital Qur'an |

The Court granted summary judgment to Defendants on Counts 1, 2, 6, 10, 11, 12, 13, 15, 16, 17, and 19.  The Court dismissed without prejudice Counts 5 and 9.  The Court denied summary judgment to Defendants on Counts 3, 4, 7, 8, and 14.  (See Order of February 26, 2007 [246] at 97-98.)

certain personal mailings (Counts 3 and 8); (2) the denial of procedural due process when prison officials rejected or seized certain mailings or publications (Counts 4, 7, and 14); and (3) alleged acts of retaliation against Plaintiff by Defendants Benton and Jones for filing grievances and initiating this action (Count 18). Because Plaintiff has been released from prison, the Court has previously dismissed Plaintiff's official-capacity claims on mootness and sovereign immunity grounds.  (See Order of Feb. 26, 2007 [246] at 3 & n.2.)  Plaintiff thus proceeds against Defendants exclusively in their individual capacities, seeking money damages.

    After holding a hearing on March 13, 2007, the Court allowed the parties to submit additional briefing on several matters which it concluded might be amenable to resolution prior to trial. Specifically, the Court invited the parties to submit briefing on (1) whether any of Plaintiff's remaining claims were barred by the relevant statute of limitations, and (2) whether Defendants were entitled to qualified immunity from any or all of Plaintiff's claims.  Both parties have since again moved for summary judgment.  (See Defs.' Supp. Mot. for Summ. J. [253]; Pl.'s Mot. for Summ. J. [258].)  Defendants have also moved the Court to reconsider its Order of February 26, 2007, insofar as it granted summary judgment

in favor of Plaintiff and against Defendants Benton and Jones on the liability portion of Plaintiff's retaliation claim.  The Court now takes up these motions.

## Discussion

### I.    Motion for Reconsideration

Defendants move for reconsideration of this Court's Order of February 26, 2007.  In that Order, the Court held that Plaintiff was entitled to judgment as a matter of law on the liability aspect of his retaliation claim (Claim 18), after observing that Defendants Benton and Jones had failed to contest Plaintiff's evidence of retaliation either in their summary judgment papers or in their Response to Plaintiff's Statement of Material Facts.  (See Order of Feb. 26, 2007 [246] at 93-95.)  Although Defendants "acknowledge they inadvertently missed arguing the substance of one of Plaintiff's numerous claims," Defendants argue that the Court should reconsider that part of its Order because a dispute of material fact exists as to whether Defendants retaliated against Plaintiff in violation of the First Amendment.  Specifically, Defendants contend that the Affidavits of Defendants Benton and Jones, which were filed contemporaneously with their summary judgment papers, dispute Plaintiff's allegations.  (See, e.g., 4th Aff. of Benton ¶ 3 [147-2] (filed Sep. 26, 2005) ("Daker's allegation that my staff and I have unlawfully retaliated against him . . . is simply not true.").)

4

Rule 60 provides that, "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect . . . ."  FED. R. CIV. P. 60(b)(1); <u>see</u> <u>also</u> <u>Cavaliere v. Allstate Ins. Co.</u>, 996 F.2d 1111, 1115 (11th Cir. 1993).  Under the Local Rules of this Court, however, "[m]otions for reconsideration shall not be filed as a matter of routine practice[,]" and only when "absolutely necessary."  LR 7.2(E), NDGa.

Having reviewed the record, the Court concludes that Defendants have demonstrated adequate cause to warrant reconsideration of the Court's Order of February 26, 2007.  Although defense counsel's failure to cite evidence on summary judgment to dispute Plaintiff's facts would normally operate to entitle Plaintiff to relief, such an omission must be considered in the context of the magnitude and numerosity of the issues and evidence in this action.  Against that backdrop, the Court finds, in its discretion under Rule 60(b), that Defense counsel's omission is excusable.[2]  Because a review of the record reflects that a

---

[2] The Court has allowed Plaintiff similar latitude in prior stages of this litigation.  In its Order of January 3, 2007 [244], the Court granted Plaintiff leave to amend his Complaint, after Plaintiff failed to include any allegations against Defendants in their individual capacities.  Over the objection of Defendants, the Court found that Plaintiff had not abandoned his only legally viable claims in this action, and exercised its discretion to allow Plaintiff to amend his Complaint yet a fourth time, and four years after the commencement of this litigation.  (<u>See</u> Order of Jan. 3, 2007 [244] at 10-11.)

dispute of fact exists as to whether Defendants Benton and Jones retaliated against Plaintiff in violation of the First Amendment, the Court agrees to reconsider its Order of February 26, 2007.  Defendants' Motion for Reconsideration [249] is **GRANTED**.  Insofar as the Court's Order of February 26, 2007, awards summary judgment in favor of Plaintiff and against Defendants Benton and Jones on the liability aspect of Plaintiff's retaliation claim (Claim 18), the Court **VACATES** that portion of its Order and **DENIES** Plaintiff's motion for summary judgment on the liability aspect of Plaintiff's claims of retaliation by Defendants.

## II.    Motions For Summary Judgment

Both parties move for summary judgment on Plaintiffs' content-based-denial and procedural-due-process claims.  After reviewing the standard on summary judgment and the contours of the qualified immunity defense, the Court will consider the merits of the parties' motions.

### A.    Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The court should view the evidence and any inferences that may be drawn from it in the light most favorable to the non-movant.  Adickes v. S.H.

Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  The

party seeking summary judgment must first identify grounds that show the absence

of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24,

106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the non-

movant, who must go beyond the pleadings and present affirmative evidence to

show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

###    B.    Qualified Immunity

Qualified immunity provides "complete protection for government officials

sued in their individual capacities if their conduct 'does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396

(1982)).  Its purpose is to "allow government officials to carry out their

discretionary duties without the fear of personal liability or harassing litigation,

protecting from suit all but the plainly incompetent or one who is knowingly

violating the federal law."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)

(internal quotation marks and citations omitted).

Qualified immunity is a question of law for the court.  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).  To be entitled to qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Lee, 284 F.3d at 1194.  The burden then shifts to the plaintiff.  Lee, 284 F.3d at 1194.  There is a two-part test to determine whether a defendant is entitled to qualified immunity.  First, a court asks " 'whether [the] plaintiff's allegations, if true, establish a constitutional violation.' "  Vinyard, 311 F.3d at 1346 (quoting Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).  Where the issue of qualified immunity is presented on summary judgment, the Court resolves all disputed facts in favor of the plaintiff, and it decides whether the supposed facts amount to a violation of Plaintiff's constitutional rights.  Purcell, 400 F.3d at 1320 (11th Cir. 2005).  Second, after sufficiently stating a constitutional violation, a court must ask whether the right was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  The salient question is whether the state of the law at the time of the alleged violation gave officials "fair

warning" that their acts were unlawful.  Hope, 536 U.S. at 740; Holmes v.

Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003); see also Vinyard, 311 F.3d at

1350-53 (articulating a tripartite analytical framework for ascertaining whether

right is "clearly established").

      While materially similar precedent or "broad statements of principle" can

establish a right with sufficient clarity to deny an officer qualified immunity, they

are not in all instances required to provide officials with the requisite notice.  See

Vinyard, 311 F.3d at 1350-52.  In some cases, "the words of a federal statute or

federal constitutional provision may be so clear and the conduct so bad that case

law is not needed to establish that the conduct cannot be lawful."  Id. at 1350.

      With these foundational principles in mind, the Court turns to examine the

merits of Plaintiff's claims.

### C.    Facts Relevant to Motions for Summary Judgment

      Both parties move for summary judgment on Plaintiff's claims arising out of

the denial of approximately 55 publications and numerous mailings while Plaintiff

was incarcerated in GDC facilities.  Defendants admit that the following

publications, listed in the chronological order of their denial, were denied to

Plaintiff:

(1)   *The Catalog of Catalogs VI*
(2)   *Mathematical Cryptology*
(3)   *Applied Cryptography*
(4)   *Using Microsoft Visual InterDev*
(5)   *C++ How to Program*
(6)   *Dubugging C++*
(7)   *Night Movements*
(8)   *Inside Kung-Fu*
(9)   *Complete Karate*
(10)  *Far Beyond Defensive Tactics*
(11)  *SAS Training Manual*
(12)  *The Encyclopedia of Survival Techniques*
(13)  *The SAS Guide to Tracking*
(14)  *Ninja*: *History and Tradition*
(15)  *Ninja: Power of the Mind*
(16a) *Ninja Mind Control*
(16b) *Bin Laden: The Man Who Declared War on America*
(17a) *Revolution by the Book*
(17b) *Different Loving*: *The World of Sexual Dominance and Submission*
(18)  *How to Survive the IRS*
(19)  *Witchcraft: A Secret History*
(20)  *Practical Electronics*
(21)  *Lip Reading Made Easy*
(22)  *HansWehr Arabic English Dictionary*
(23)  *Que Tal?*
(24)  *C++ from the Ground Up*
(25)  *Visual Basic from the Ground Up*
(26)  *Ditch Medicine*
(27)  *Do it Yourself Medicine*
(28)  *The Mammoth Book of Love and Sensuality*
(29)  *The Joy of Sex*
(30)  *Building Bots: Designing and Building Warrior Robots*
(31)  *Gonzo Gizmos*
(32)  *Booby Trap Identification and Response Guide*
(33)  *Death Investigator's Handbook and DEA Investigator's Manual*
(34)  *Georgia Criminal Trial Practice*
(35)  *Georgia Criminal Trial Practice—Forms*
(36)  *Georgia Handbook on Criminal Evidence*
(37)  *Green's Georgia Law on Evidence*
(38)  *Criminal Investigation: Basic Perspectives*
(39)  *Law Enforcement Technology 260: Criminal Investigation*
(40)  *U.S. Army Special Forces Medical Handbook*
(41)  *Military Book Club Emergency Medical*

> *Procedures*
> (42) *The Tao of Sexuality*
> (43) *Ragnar's Guide to the Underground Economy*
> (44) *Investing Offshore*
> (45a) *Electronic Circuits*
> (45b) *Secret of an Old-Fashioned Spy*
> (46) *The Black Science: Ancient and Modern Techniques of Ninja Mind Control*
> (47) *The Kama Sutra*
> (48) *Samurai: The World of the Warrior*
> (49) *Leadership Lessons of the Navy Seals*
> (50) *Experiments in Electronic Devices and Circuits*
> (51) three *Fantagraphics* books
> (52) *Guide to Getting it On*

(See Order of Feb. 26, 2007 [246] at 57-58.)[3]

Plaintiff alleges that the above publications[4] were denied on the basis of

---

[3] In its Order of February 26, 2007, the Court mistakenly listed *Ninja Mind Control* and *Bin Laden: The Man Who Declared War on America* as a single book denoted as Number 16 on the list, mistakenly listed *Revolution by the Book* and *Different Loving* as a single book denoted as Number 17 on the list, and mistakenly listed *Electronic Circuits* and *Secret of an Old-Fashioned Spy* as Number 45 on the list.  (See Order of Feb. 26, 2007 [246] at 57-58.)  The list provided above corrects these errors, but maintains the prior numbering of the Court's February 26th Order by listing these books as 16a, 16b, 17a, 17b, 45a, and 45b, respectively.

[4] Plaintiff also complains of the denial of various books whose titles he cannot recall, including books on shorthand and Sybase (see PSMF ¶15); a French, German, and Russian

content in the absence of a valid penological interest, thus violating the First

Amendment under the standard provided by <u>Thornburgh v. Abbott</u>, 490 U.S. 401,

407, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989), and <u>Turner v. Safley</u>, 482 U.S. 78,

85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).  Besides the conflicting testimony of

Plaintiff and the various Defendant prison officials involved in exclusionary

decisions, the record is sparse concerning the specific reason each publication was

denied Plaintiff.  Plaintiff offers into evidence numerous "Inmate Property

Disposal Agreements" signed by GDC prison officials, which he asserts document

the exclusion and disposal of the various books listed above.  (<u>See</u> Attachment A to

24th Aff. of Daker [258-5].)  The Inmate Property Disposal Agreement form is

---

textbook, and a Spanish magazine (<u>see</u> PSMF ¶ 16); two books "whose names Plaintiff does not
recall because they were long and technical," (<u>see</u> PSMF ¶ 19); books on Russian, German, and
computers (<u>see</u> PSMF ¶ 21); and a book on Gregg shorthand, and a Hebrew calendar (<u>see</u> PSMF
¶ 28).  Without specifying the title of the publications denied, the Court has no basis upon which
to consider the constitutionality of any denial of these books based upon content.  Accordingly,
the Court concludes that Plaintiff has advanced insufficient evidence in support of these claims,
and Defendants are entitled to qualified immunity.  To the extent that Defendants seek summary
judgment on Plaintiff's First-Amendment claims with respect to publications for which he has
provided no title, including those listed immediately above, their motion is **GRANTED**.

   At the hearing held on March 13, 2007, Plaintiff conceded that Books 9, 10, 11, 12, 13,
32, 33, and 46 could be constitutionally denied on the basis of content.  The Court finds Plaintiff
has abandoned his content-based challenges to the denial of these books.  Thus, insofar as
Defendants seek summary judgment on Plaintiff's First-Amendment claims with respect to (9)
*Complete Karate*, (10) *Far Beyond Defensive Tactics*, (11) *SAS Training Manual,* (12) *The
Encyclopedia of Survival Techniques*, (13) *The SAS Guide to Tracking*, (32) *Booby Trap
Identification and Response Guide*, (33) *Death Investigator's Handbook and DEA Investigator's
Manual*, and (46) *The Black Science: Ancient and Modern Techniques of Ninja Mind Control*,
their motion is **GRANTED**.

apparently designed to document that a prisoner was provided notice of a publication or mailing denial.  Each form provides that: "I, [prisoner name], have been notified by [prison official name] on [date] that the items listed below are contraband and that I have thirty (30) days to [either mail out the item or arrange to have it picked up.]" Below the inmate's signature are a number of spaces in which the prison official may document the specific items rejected.  The forms, however, contain no space to document the reasons for the denial of a publication or mailing.  On virtually all forms entered into the record in this case, the forms, although providing that "books" were denied to Plaintiff, contain no titles and no written description of the prison official's reasons for the denial.  (See Attachment A to 24th Aff. of Daker [258-5].)

In addition to his content-based challenge, Plaintiff brings a procedural due process challenge, alleging that each publication and mailing was denied by GDC officials without providing Plaintiff with appropriate notice, a reasonable opportunity to challenge the initial decision, and an ultimate decision by a disinterested party not privy to the initial censorship decision, as is required in this Circuit by Guajardo v. Estelle, 580 F.2d 748, 762 n.10 (5th Cir. 1978).

Defendants respond by contending that Plaintiff's claims respecting Books 1-4 are barred by the statute of limitations, and Plaintiff's claims respecting the

remainder of the books fail because Defendants are entitled to qualified immunity.

### D.      Statute of Limitations

As the Court noted in its Order of February 26, 2007, Plaintiff's allegations concerning content-based denials of mailings and publications and denial of procedural due process date back to August of 1997.  (See Order of Feb. 26, 2007 [246] at 69 n.14.)  Georgia's two-year statute of limitations applies to claims brought under § 1983.  O.C.G.A. § 9-3-33; see also Porter v. Ray, 461 F.3d 1315, 1323 (11th Cir. 2006) (applying O.C.G.A. § 9-3-33 to claims brought under § 1983).  Thus, any claims which arose prior to August 18, 2001, are barred by the statute of limitations.

Plaintiff's claims concerning the denial of mail and publications at Al Burruss CTC between 1997 and 1999 are barred by the statute of limitations, as well as Plaintiff's claims concerning the denial of (1) *The Catalog of Catalogs VI* in 1999 and the denial of (2) *Mathematical Cryptology*, (3) *Applied Cryptography*, and (4) *Using Microsoft Visual InterDev* on May 8, 2001.  Although Plaintiff asserts that the denial of these materials and the concomitant denial of process constitutes a "continuing violation" with consequences continuing into the limitations period, the content-based denial of a publication and the failure to provide an adequate post-denial procedure are both discrete acts that trigger the

statute of limitations at the time of their occurrence.  Because Plaintiff has not demonstrated that an administrative grievance procedure tolled the limitations period, see Rubin v. O'Koren, 644 F.2d 1023 (5th Cir. Unit B 1981), and because Plaintiff seeks only monetary compensation for the "consequence of a one time violation," as opposed to a prospective remedy for continuing violations, see Lovett v. Ray, 327 F.3d 1181, 1183 (11th Cir.2003), the continuing violation doctrine does not salvage those of Plaintiff's claims which arose outside of the limitations period.  Accordingly, insofar as Defendants seek summary judgment on all claims arising out of the denial of mail and publications at Al Burruss CTC between 1997 and 1999 and all claims arising out of the denial of (1) *The Catalog of Catalogs VI*, (2) *Mathematical Cryptology*, (3) *Applied Cryptography*, and (4) *Using Microsoft Visual InterDev*, Defendants' Motion is **GRANTED**.

### E.     Qualified Immunity with Respect to Plaintiff's Content-Based Denial Claims (Counts 3, 8)

Defendants raise qualified immunity as to the remainder of Plaintiff's claims alleging the denial of mailings and publications on the basis of content in violation of the First Amendment.  As stated, in determining whether Defendants have qualified immunity, the Court determines (1) whether the plaintiff's allegations, if true, establish a constitutional violation, and (2) whether the right was "clearly established."  Saucier, 533 U.S. at 201.

15

Regulations affecting the sending of mailings and publications to prisoners are analyzed under the <u>Turner</u> reasonableness standard.  <u>Thornburgh</u>, 490 U.S. at 413 (citing <u>Turner</u>, 482 U.S. at 89).  A prison regulation restricting access to protected materials is valid if it is reasonably related to legitimate penological interests.  <u>Id.</u>  Moreover, "considerable deference" should be afforded to "prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."  <u>Id.</u> at 408.

In <u>Thornburgh</u>, the Supreme Court facially approved regulations excluding publications which the warden determined were "detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity."  <u>Id.</u> at 416 (quoting 28 C.F.R. §§ 540.70(b); 540.71(b)).  The regulations provided several criteria for rejection, including whether the publication "depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices," "depicts, encourages, or describes methods of escape from correctional facilities," "is written in code," "depicts, describes or encourages activities which may lead to the use of physical violence or group disruption," "encourages or instructs in the commission of criminal activity," or is "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity."  <u>See id.</u>

16

(quoting 28 C.F.R. § 540.71(b)).  The regulations, however, restricted the warden

from rejecting a publication "solely because its content is religious, philosophical,

political, social or sexual, or because its content is unpopular or repugnant."  Id.

Following Thornburgh, lower courts have afforded considerable latitude to

decisions by prison officials to exclude certain publications from prisoners on the

basis of content.  See McCorkle v. Johnson, 881 F.2d 993, 995 (11th Cir. 1989)

(finding content-based restriction on satanic materials withstood First Amendment

scrutiny because "[i]t is an informed and measured response to the violence

inherent in Satan worship, and to the potential disorder that it might cause within

the prison"); Thompson v. Patteson, 985 F.2d 202, 206 (5th Cir. 1993) (upholding

prison regulation which prohibited materials that prison officials found would

encourage deviant sexual behavior); Amatel v. Reno, 156 F.3d 192, 193 n.1, 195-

204 (D.C. Cir. 1998) (upholding ban on distribution of all commercial material that

"is sexually explicit or features nudity" as reasonably related to goal of

rehabilitation, and stating that "[f]or judges seeking only a reasonable connection

between legislative goals and actions, scientific indeterminacy is determinative");

Duamutef v. Hollins, 297 F.3d 108, 112 (2d Cir. 2002) (applying "heightened

deference" to prison official's decision to censor a controversially titled book

concerning financial advice, and finding no constitutional violation); cf. Abernathy

v. Cunningham, 393 F.2d 775, 779 (4th Cir. 1968) (finding a restriction on religious magazines constitutional in light of "considered opinion of the prison authorities that such material . . . would, in this setting, be inflammatory and subversive of discipline").

Nevertheless, where a prison official denies a publication on the basis of content without a legitimate penological purpose, courts have found a constitutional violation.  See, e.g., Sutton v. Rasheed, 323 F.3d 236 (3d Cir. 2003) (concluding denial of Nation of Islam religious books was unconstitutional but defendants were nonetheless entitled to qualified immunity because right not clearly established); McCabe v. Arave, 827 F.2d 634, 638 (9th Cir. 1987) (addressing a "ban" on Church of Jesus Christ books touting white supremacy from a prison library and holding "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation"); Brown v. Peyton, 437 F.2d 1228, 1232-33 (4th Cir. 1971) (concluding, in a case challenging denial of several religious magazines that court had previously held could validly be restricted, that a plenary hearing should nevertheless be conducted to determine whether a denial of the current issue of magazine could be justified).

18

As the Court explained in its Order of February 26, 2007, "it is generally sufficient for a prison official to base a security decision on the title alone." Duamutef, 297 F.3d at 113.  Such discretion takes into account the "limited resources of prison systems and the intense pressure to prevent security problems." Id.  Thus, in examining whether a denial of a particular publication on the basis of content violates the First Amendment, the Court determines whether the reason proffered by the prison official for the security decision was reasonable in light of the title of the publication (or, if conducted, a review of its content), the individual circumstances of the prisoner, and any specific security concerns at the penal institution.[5]  Id.

_____

[5] In adopting this legal standard, the Court is persuaded by the decision of the Second Circuit Court of Appeals in Duamutef v. Hollins, 297 F.3d at 110.  There, a prisoner brought suit claiming a prison official violated the First Amendment by censoring a book providing investment advice, entitled *Blood in the Streets: Investment Profits in a World Gone Mad*.  Id. After the prison official conceded that the publication was a "harmless economics book," the district court concluded that the prison official had violated the First Amendment and was not entitled to qualified immunity.  Id. at 111.  On appeal, however, the Second Circuit reversed, ruling that, in light of the plaintiff's disciplinary history and the "paramount importance of exercising caution in matters of prison security," no rational juror could find that the censorship decision was not reasonably related to a legitimate penological interest.  Id. at 113.  Rather, the court concluded, the prison official's decision to exclude the publication at issue was reasonable as a matter of law based on its title alone.  It explained:

> It is true that the publication that sparked their decision to institute
> the mail watch was a harmless economics book.  A title containing
> the phrase "Blood in the Streets," however, could arouse concern
> in any reasonable prison official.  Even if, as the district court
> suggested, a jury could find that a more thorough examination of
> the book would have assuaged such concerns, we find that it is
> generally sufficient for a prison official to base a security decision

Defendants, for their part, deny that they made exclusionary decisions as to certain books on the basis of content.  (See, e.g., Defs.' Resp. to PSMF ¶¶ 8, 11, 23.)  Nevertheless, Defendants admit that they have virtually no independent recollection of the specific reasons for denying the books at issue.  Rather, they contend that Plaintiff was "more likely" denied these books either because he was in excess of the total amount of books allowed per prisoner or because he failed to fill out package request forms.

Defendants' lack of documentation combined with Defendants' lack of memory frustrates the Court's ability to analyze Plaintiff's challenges.[6]  The Court is faced with considering "likely" reasons for denials, and, at least with respect to

_____

> on the title alone.  Considering the limited resources of prison systems and the intense pressure to prevent security problems, we cannot expect more of corrections personnel in most circumstances.

Id.

[6] Because of the sparse record in this case, the Court has previously concluded that Plaintiff has come forward with evidence in the form of affidavits and grievance forms establishing that a dispute of fact exists concerning whether the alleged 55 publications were in fact denied on the basis of content or on the basis of the so-called "more likely" reasons proffered by Defendants.  (Order of Feb. 26, 2007 at 67.)  Plaintiff has introduced over 65 package request forms which evidence that he properly requested each of the books at issue.  (See Exs. A-JJ to 24th Daker Aff. [258-5]).  Moreover, Plaintiff has introduced evidence establishing that Defendants made statements concerning the content of various publications in explaining to Plaintiff the reasons for their denial.  (See 24th Daker Aff. [258-5].)  Thus, as the Court discusses in more detail below with reference to specific books, the Court concludes that a genuine dispute of material fact exists concerning whether Defendants in fact denied Plaintiff the remaining materials in issue on the basis of content, or on the basis of procedural infractions.

certain books, "possible" legitimate content-based reasons for denying the books at issue.  Because of the unique nature of this case, however—and specifically, because Plaintiff brings only individual capacity damages claims against Defendants—the Court will consider the proffered (but possibly *post hoc*) content-based reasons for denying Plaintiff's publications.  Plaintiff has the burden to demonstrate that he suffered a cognizable First Amendment injury and that Defendants' conduct was the proximate cause of that injury.  Thus, in the Court's view, where Defendants demonstrate that Plaintiff would not have otherwise been entitled to a book under the First Amendment—because a legitimate reason would have caused the prison official deny the book based upon content in any event—Plaintiff cannot be said to have suffered a cognizable First Amendment injury that was *proximately caused* by Defendants' unconstitutional conduct. See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) (holding, in context of retaliatory firing claim, that constitutional violation must be "motivating factor" of challenged decision, but if government shows by a preponderance of the evidence that it would have reached the same decision for other, constitutionally proper, reasons, plaintiff is not entitled to recover).

21

Having considered the contours of a prisoner's First Amendment right to be free from unreasonable content-based exclusions of publications, and the import of the Mt. Healthy proximate cause requirement, the Court turns to examine Defendants' claim to qualified immunity with respect to each publication.

1.    *Materials Upon Which Plaintiff has Failed to Identify any Defendant as Participating in a Content-Based Decision to Deny*

As an initial matter, the Court can quickly dispose of Plaintiff's claims concerning several denials of publications by individual prison officials not present in this action.  Plaintiff contends that during his incarceration at Phillips State Prison and Rivers State Prison, he was denied several books on the basis of content, including: (5) *C++ How to Program*, (6) *Dubugging C++*, (7) *Night Movements*, and (8) *Inside Kung-Fu.*   Plaintiff has, however, failed to allege that any Defendant in this case participated in the decision to deny Plaintiff these books on the basis of content.  As Defendants correctly point out, Defendants Benton and Jones, as supervisory officials of the GDC, may not be held vicariously liable under § 1983 for the acts of their inferiors.  See Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).  Because Plaintiff has failed to allege that Defendants Benton and Jones or any other prison official in this action directly participated in a decision to deny Plaintiff these books on the basis of content, Defendants are

entitled to summary judgment.  Insofar as they seek judgment as a matter of law on

Plaintiff's content-based denial claims concerning (5) *C++ How to Program*, (6)

*Dubugging C++*, (7) *Night Movements*, and (8) *Inside Kung-Fu*, Defendants'

Motion for Summary Judgment is **GRANTED**.

### 2.    *Materials Containing Sexually Explicit Content*

Defendants raise qualified immunity with respect to the books (17b)

*Different Loving: The World of Sexual Dominance and Submission*, (19)

*Witchcraft: A Secret History*, (28) *The Mammoth Book of Love and Sensuality*, (29)

*The Joy of Sex*, (42) *The Tao of Sexuality*, (47) *The Kama Sutra*, (51) the three

*Fantagraphics* books, and (52) *Guide to Getting it On*, contending that these

books, which contain nudity and sexually explicit material, encourage sexually

deviant behavior and may lead to violence among inmates and other internal

security problems because such materials are traded and exchanged among

prisoners.  (See Chapman Aff. ¶ 18.)

Defendants have introduced evidence that the book (17b) *Different Loving:*

*The World of Sexual Dominance and Submission* contains "graphic accounts of

whipping, spanking, 'golden showers' (urination), the use of hot wax and

clothespins, . . . tattooing, female wrestling and . . . S & M."  (See Defs.' Resp. to

PSMF ¶ 5.)  Moreover, the record is undisputed that the books (19) *Witchcraft: A*

*Secret History*, (28) *The Mammoth Book of Love and Sensuality*, (29) *The Joy of Sex*, (42) *The Tao of Sexuality*; *The Kama Sutra*, (51) the three *Fantagraphics* books, and (52) *Guide to Getting it On* contain nudity, if not sexually explicit material.  (See Pl.'s Resp. to Defs.' Mot. for Summ. J. 8-9; Defs.' Resp. to PSMF ¶¶ 30-31; Defs.' Ex. 10 to Supp. Mot. for Summ. J. [253-28].)

In Thornburgh, the Supreme Court approved of a regulation restricting "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." See Thornburgh, 490 U.S. at 413 (quoting 28 C.F.R. § 540.71(b)).  The D.C. Circuit in Amatel v. Reno went even further, upholding a regulation restricting all commercial material that "is sexually explicit or features nudity" as reasonably related to the goal of rehabilitation.  156 F.3d at 193 n.1, 195-204.  Finally, the Fifth Circuit has recognized that prison officials have broad discretion to limit prisoner access to sexually explicit material.  See Thompson, 985 F.2d at 206 n.1 ("Access to sexually explicit materials is restricted not merely in order to promote the rehabilitation of the particular recipient from his past offenses, but to maintain order and safety in an overall environment in which sex offenses are a continuing threat.").

Consistent with the reasoning expressed in these cases, this Court agrees with Defendants that the denial of publications which stimulate sexual desire is reasonably related to maintaining security and good order in a prison institution. Because a prison official could reasonably conclude based on the title of each of the above-referenced books, or a cursory review of their content, that each contains content which may encourage sexually deviant behavior and may lead to violence among inmates and other internal security problems, Plaintiff has failed to allege a constitutional violation with respect to these books.[7]  Moreover, Plaintiff has failed to direct the Court to any precedent which clearly establishes the right to access books of a similar title or description.  For both reasons, Defendants are entitled to qualified immunity.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (17b) *Different Loving: The World of Sexual Dominance and Submission*, (19) *Witchcraft:  A Secret History*,

---

[7] The book (19) *Witchcraft: A Secret History* presents a closer question, since, unlike the others discussed above, its title does not conspicuously indicate the presence of sexually provocative content, and it appears to contain only a single image illustrating the exposed breasts of the Greek Goddess Hecate.  (See PSMF ¶ 7.)  Nevertheless, in light of the considerable deference afforded to prison officials, the Court concludes that Plaintiff has failed to demonstrate that a denial of this publication was not reasonably related to security and good order.  It bears mention that Plaintiff, a known Muslim with no asserted religious belief in witchcraft, has introduced no evidence to call into question the reasons Defendants proffer for denying Plaintiff this particular publication, and does not allege that the denial amounted to a burden on his religious practice.  See Dettmer v. Landon, 799 F.2d 929, 931 (4th Cir. 1986) (holding that prison officials could not deny religious articles to individuals practicing Wiccan religion).

(28) *The Mammoth Book of Love and Sensuality*, (29) *The Joy of Sex*; (42) *The Tao of Sexuality*, (47) *The Kama Sutra*, (51) three *Fantagraphics* books, and (52) *Guide to Getting it On*, their Motion is **GRANTED**.

> 3.     *Materials Containing Instructions on Fighting Techniques and Military Procedures and Materials Which Could Assist a Prisoner in Effecting an Escape*

Defendants raise qualified immunity with respect to the books (14) *Ninja*: *History and Tradition*, (15) *Ninja: Power of the Mind*, (16a) *Ninja Mind Control*, and (48) *Samurai: The World of the Warrior*, contending that these books may be denied based on their titles alone or based upon their content because each contains instructions on fighting techniques and physical maneuvers on how to take down or disable an opponent, and thus are a security threat to a prison institution.  (See Defs.' Resp. to PSMF ¶¶ 2, 30; Perry Aff. ¶ 8.)  Defendants also raise qualified immunity with the respect to the books (26) *Ditch Medicine*, (27) *Do it Yourself Medicine*, (40) *U.S. Army Special Forces Medical Handbook*, (41) *Military Book Club Emergency Medical Procedures*, (45b) *Secret of an Old-Fashioned Spy*, and (49) *Leadership Lessons of the Navy Seals*, contending that these books may be denied based on their titles alone or based upon their content because such books contain materials concerning military procedures or "surviving in the field and treating . . . injuries," and could thus assist in planning an escape attempt.

(See Defs.' Resp. to PSMF ¶¶ 11, 27, 29, 30; 13th Benton Aff. ¶ 17; 14th Benton Aff. ¶ 5.)

In Thornburgh, the Supreme Court approved of a regulation restricting material which "depicts, encourages, or describes methods of escape from correctional facilities" or "depicts, describes or encourages activities which may lead to the use of physical violence or group disruption."  See Thornburgh, 490 U.S. at 413 (quoting 28 C.F.R. § 540.71(b)).   The Court agrees with Defendants that the titles of these books could lead a reasonable prison official to conclude that they would assist in planning an escape from a prison institution or may lead to the use of physical violence or group disruption.  Moreover, Plaintiff has failed to direct the Court to any precedent which clearly establishes the right to access books of a similar title or description.  For both reasons, Defendants are entitled to qualified immunity.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (14) *Ninja*: *History and Tradition*, (15) *Ninja: Power of the Mind*, (16a) *Ninja Mind Control*, (26) *Ditch Medicine*, (27) *Do it Yourself Medicine*, (40) *U.S. Army Special Forces Medical Handbook*, (41) *Military Book Club Emergency Medical Procedures*, (45b) *Secret*

*of an Old-Fashioned Spy*, (48) *Samurai: The World of the Warrior*, and (49) *Leadership Lessons of the Navy Seals*, their Motion is **GRANTED**.

    4.    *Materials Concerning Criminal Investigatory Techniques*

Defendants raise qualified immunity with the respect to the books (38) *Criminal Investigation: Basic Perspectives* and (39) *Law Enforcement Technology 260: Criminal Investigation*, contending that these books could be used to facilitate criminal activity because they provide insight into law enforcement investigation techniques.  (See Hall Aff. ¶ 25; Defs.' Br. in Supp. of Supp. Mot. for Summ. J. [253-2] at 10 n.7.)[8]

In Thornburgh, the Supreme Court approved of a regulation restricting material which "encourages or instructs in the commission of criminal activity." See Thornburgh, 490 U.S. at 413 (quoting 28 C.F.R. § 540.71(b)).  The Court agrees with Defendants that the titles of these books could lead a reasonable prison official to conclude that they would assist in planning or executing criminal activity.  Moreover, Plaintiff has failed to direct the Court to any precedent which clearly establishes the right to access books of a similar title or description.  For both reasons, Defendants are entitled to qualified immunity.

---

[8] Plaintiff sought these materials in connection with a request to take correspondence courses of similar descriptions.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (38) *Criminal Investigation: Basic Perspectives*; (39) *Law Enforcement Technology 260: Criminal Investigation*, their Motion is **GRANTED**.

       5.     *Materials Containing Instructions on Building Electronic Devices or Manipulating Electronic Circuitry*

Defendants raise qualified immunity with respect to the books (30) *Building Bots*, (31) *Gonzo Gizmos*, (45a) *Electronic Circuits*, and (50) *Experiments in Electronic Devices and Circuits*, contending that these books provide instructions on building dangerous weaponry or knowledge about electronics and electronic circuits that can be used to bypass security systems.  (See Defs.' Resp. to PSMF ¶ 19; 30; 3rd Aff. Hall ¶ 2.)  In Thornburgh, the Supreme Court approved of regulations restricting material which "depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices," "depicts, encourages, or describes methods of escape from correctional facilities," "depicts, describes or encourages activities which may lead to the use of physical violence or group disruption," and "encourages or instructs in the commission of criminal activity."  Thornburgh, 490 U.S. at 413 (quoting 28 C.F.R. § 540.71(b)). The Court agrees with Defendants that the titles of these books could lead a reasonable prison official to conclude that they would assist in planning or

executing criminal activity, planning a criminal escape, constructing weapons or incendiary devices, or otherwise disrupt the safety and good order of the prison institution.  Moreover, Plaintiff has failed to direct the Court to any precedent which clearly establishes the right to access books of a similar title or description. For both reasons, Defendants are entitled to qualified immunity.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (30) *Building Bots*, (31) *Gonzo Gizmos*, (45a) *Electronic Circuits*, and (50) *Experiments in Electronic Devices and Circuits*, their Motion is **GRANTED**.

6.     *Materials Containing Instructions on Avoiding Tax Liabilities*

Defendants raise qualified immunity with respect to the book (18) *How to Survive the IRS*, contending that the Georgia Department of Corrections has experienced problems with prisoners attempting to perpetrate tax fraud "by falsifying income tax returns in order to get illegitimate refunds."  (Chatman Aff. ¶ 18.)  As stated, a prison official may exclude a publication if such an exclusion is reasonably related to preventing the commission of criminal activity.  Thornburgh, 490 U.S. at 413.  The Court agrees with Defendants that the title *How to Survive the IRS* could lead a reasonable prison official, cognizant of prior acts of tax fraud occurring within the prison facility, to conclude that it would assist in planning or

executing criminal activity.  Moreover, Plaintiff has failed to direct the Court to any precedent which clearly establishes the right to access books of a similar title or description.  For both reasons, Defendants are entitled to qualified immunity.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (18) *How to Survive the IRS*, their Motion is **GRANTED**.

       7.    *Bin Laden:  The Man Who Declared War on America*

Defendants raise qualified immunity with respect to their denial of the book (16b) *Bin Laden:  The Man Who Declared War on America*, contending that allowing the book would be detrimental to the security, good order, and discipline of the prison.  (Perry Aff. [253-3] ¶ 9.)  Defendants denied this publication while Plaintiff was incarcerated in Hancock State Prison on May 7, 2003.  According to Defendants, a book "describing the orchestration of 9-11 would cause valid security concerns."  (Perry Aff. ¶ 9.)  Moreover, Deputy Warden Perry believed "that the Bin Laden book could have incited inmates to attack Muslim prisoners or even non-Muslim prison[er]s perceived to somehow be associated [with] Bin Laden or the attack on the World Trade Center."  (Id.)  Plaintiff responds that Defendants' concerns are unreasonable because the same book was available to

prisoners in the Rivers State Prison library in 2002, and no prisoner violence

occurred as a result of its availability in that institution.  (See PSMF ¶ 4.)

The record does not contain any evidence concerning the content of the *Bin*

*Laden* publication.  Its title alone does not reflect whether it contains a biographical

account of the well-known and self-admitted mastermind of the 9/11 attacks or an

inciting call to violence against the United States.  Although relying on other

prisoner's reactions to otherwise protectable information or expression in certain

contexts may raise First Amendment concerns, see O'Bryan v. Bureau of Prisons,

349 F.3d 399, 401 (7th Cir. 2003) (Easterbrook, J.) (noting that relying on other

inmates' reactions to quell expression "is a form of heckler's veto"), the Eleventh

Circuit has recognized as a valid penological concern the potential disorder that

may arise from a prisoner's possession of potentially inflammatory materials.  See

McCorkle v. Johnson, 881 F.2d 993, 995 (11th Cir. 1989) (finding that exclusion

of Satanic publication was reasonable in part because "[i]t is an informed and

measured response to . . . the potential disorder that it might cause within the

prison").  Indeed, prison officials have considerable discretion to "anticipate

security problems and . . . adopt innovative solutions to the intractable problems of

prison administration."  Turner, 482 U.S. at 89.  In view of this discretion, the

Court concludes that Defendants' decision to exclude *Bin Laden: The Man Who*

*Declared War on America* was reasonably related to the valid penological interest in maintaining security and good order.[9]  Moreover, Plaintiff has failed to direct the Court to any precedent which clearly establishes the right to access books of a similar title or description.  For both reasons, Defendants are entitled to qualified immunity.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (16b) *Bin Laden: The Man Who Declared War on America*, their Motion is **GRANTED**.

> 7.    *Materials Upon Which Defendants Have Failed to Proffer Any Legitimate Reason for a Content-Based Denial*

Defendants raise qualified immunity with respect to the remainder of the books at issue in this litigation, including (17a) *Revolution by the Book*, (20) *Practical Electronics*, (21) *Lip Reading Made Easy*, (22) *HansWehr Arabic English Dictionary*, (23) *Que Tal?*, (24) *C++ from the Ground Up*, (25) *Visual Basic from the Ground Up*, (34) *Georgia Criminal Trial Practice*, (35) *Georgia*

---

[9] The availability of the same publication at an earlier date and at a different prison institution within the Georgia Department of Corrections does not convince this Court that the reasons proffered by Defendants for its denial are unreasonable.  The discretion afforded to Warden Chapman and Deputy Warden Perry does not ebb and flow based upon the decisions of other prison officials made at different times in different prison facilities.  Because both officials have demonstrated that their decision to exclude the *Bin Laden* publication was reasonably related to legitimate penological concerns present at the Hancock State Prison, Plaintiff has not asserted a valid First Amendment claim.

*Criminal Trial Practice—Forms*, (36) *Georgia Handbook on Criminal Evidence*, (37) *Green's Georgia Law on Evidence*, (43) *Ragnar's Guide to the Underground Economy*, and (44) *Investing Offshore*.  As to these books, Defendants contest that they were denied for content-based reasons.  Moreover, they do not offer any alternative content-based justification for their denial.  Instead, Defendants advance that these books were "more likely" denied principally because Plaintiff was in possession of more books than he was allowed under GDC rules.  But Defendants' failure to provide Plaintiff with notice containing their reasons for denial—combined with Defendants' lack of recollections concerning the true reasons for their denial of these books—affords the Court no basis to conclude as a matter of law that these books were properly denied on the basis of Plaintiff's non-compliance with the prison's procedural rules.[10]  As the Court discusses below, because a dispute of fact exists as to whether such books were denied for procedural or content-based reasons, and because Defendants have asserted no reason, legitimate or otherwise, for their content-based denial, the Court is constrained to deny qualified immunity on the present record.

_____

[10] As the Court concludes below, Plaintiff has adequately alleged a violation of the procedural-due-process mandates of the Fourteenth Amendment.

34

a.    (17a) *Revolution by the Book*

Plaintiff contends that, while he was incarcerated at Hancock State Prison, Defendant Deputy Warden Perry denied him the book *Revolution by the Book* on May 7, 2003, on the same day she also denied *Bin Laden: The Man Who Declared War on America*, *Different Loving*, and *How to Survive the IRS*.  Plaintiff testifies that he "was told by the mailroom officer, Ofc. K. Harden, that [] warden Perry would not allow [these four books] because their content posed a security threat." (See PSMF ¶ 3.)  Plaintiff offers into evidence an "Inmate Property Disposal Agreement" signed by Officer Harden on May 7, 2003, which evidences Defendants' rejection of four unspecified books for unspecified reasons on that date.  (See Ex. B to Pl.'s Am. Mot. for Summ. J. [258-5].)

Neither Defendant Deputy Warden Perry nor Defendant Warden Chapman recalls denying Plaintiffs the above four titles, and they do not offer any documentary evidence reflecting the reasons for their denial.  Warden Chapman "admit[s] that Plaintiff could have been denied *Bin Laden: The Man Who Declared War on America*, *Different Loving*, and *How to Survive the IRS* for security reasons," but claims that he "would not have denied *Revolution by the Book* based

35

upon content."[11]  (Chapman Aff. [253-4] ¶ 18.)  Rather, Warden Chapman believes

these books were more likely denied due to Plaintiff's violation of rules regulating

excessive property.  (See Defs.' Resp. to PSMF ¶ 3; Chapman Aff. [253-4] ¶ 17.)

In support of this assertion, Defendants state that "when inmate Daker transferred

from Rivers State Prison to Hancock State Prison [in January of 2003], he had 22

books, and 1 magazine," in excess of the 8-publication limit imposed by the GDC.

(Chapman Aff. [253-4] ¶ 15.)  Then, "he continued to order and receive additional

books . . . [and] by the time inmate Daker left Hancock State Prison and was

transferred to Dodge State Prison [in August of 2003], he was in possession of 55

books, 22 magazines, and 9 newspapers," well in excess of the 8-publication limit.

(Id. 16.)

   On this record, the Court concludes that a genuine dispute of fact exists as to

whether Defendant Deputy Warden Perry or Defendant Warden Chapman denied

*Revolution by the Book* based upon content.  Plaintiff has advanced sworn

testimony that indicates Defendant Perry excluded *Revolution by the Book* based

_____

   [11] Defendants also contend that Plaintiff failed to file a grievance with respect to
*Revolution by the Book*.  Plaintiff testifies in response that he filed Grievance # 0541-03-0179
relating to the content-based denial of books while he was incarcerated at the Hancock State
Prison in May of 2003.  (See 24th Daker Aff. [258-5] ¶ 33.)  Defendants have not responded to
Plaintiff's sworn assertion that he filed an appropriate administrative grievance with respect to
this book.  On this record, the Court concludes that Plaintiff has demonstrated that he exhausted
administrative remedies as required by the PLRA.

36

on its content, and Defendants' own evidence refutes that the denial was based on an application of the 8-publication rule.  Despite the 8-publication limit, Defendants Perry and Chapman apparently allowed Plaintiff to request and receive over 30 *other* publications during Plaintiff's incarceration at Hancock State Prison, since, according to their evidence, he arrived at Hancock State Prison with 22 books, and left eight months later with 55 books.  The evidence, viewed in a light most favorable to Plaintiff, reflects that Defendants have offered a *post hoc* procedural justification for a content-based denial.

Additionally, the Court concludes that Defendants Perry or Chapman are not entitled to qualified immunity on the present record.  Defendant Chapman has effectively admitted that there exists no legitimate reason to deny Plaintiff the requested publication, by asserting that he "would not have denied *Revolution by the Book* based upon content."  (Id. ¶ 18.)  Plaintiff has thus alleged a colorable claim under the First Amendment for a content-based violation.  Since it is clearly established that Defendants must assert *some* reason for denying a publication based upon content, see Thornburgh, 490 U.S. at 413—and since Defendants have, on the present record, failed to do so—the present record affords the Court no basis upon which to conclude that Defendants are entitled to qualified immunity.

b.    (20) *Practical Electronics*, (21) *Lip Reading Made Easy*, (22) *HansWehr Arabic English Dictionary*, (23) *Que Tal?*, (24) *C++ from the Ground Up*, (25) *Visual Basic from the Ground Up*

Plaintiff contends that, on August 11, 2003, while he was incarcerated at Dodge State Prison, Defendant Enoch Waters denied him (20) *Practical Electronics*, (21) *Lip Reading Made Easy*, (22) *HansWehr Arabic English Dictionary*, (23) *Que Tal?*, (24) *C++ from the Ground Up*, and (25) *Visual Basic from the Ground Up* on the basis of content.  Plaintiff testifies that Defendant Enoch "would not let him have any of these six [books] and made statements such as 'you don't need to be studying this.'" (PSMF ¶ 8; 24th Aff. Daker ¶ 8.) Although Plaintiff admits to possessing more than 8 books upon his transfer to Dodge State Prison, Plaintiff testifies that Defendant Waters "let him pick 8 books to keep, but refused to let him pick any of the 6 books listed above as any of the 8 books that Plaintiff could keep."  (PSMF ¶ 8; 24th Aff. Daker ¶ 8.)

Defendant Waters disputes that he denied the books on the basis of content, instead contending that Plaintiff was in violation of the 8-book limitation and thus was not allowed to keep any of the requested six books.[12]  (See Waters Aff. [253-

---

[12] Defendant Waters also contends that Plaintiff failed to exhaust administrative remedies with respect to this publication.  Plaintiff responds, however, that because he was considered a "sleeper" inmate during his confinement at Dodge State Prison, he was prohibited from filing grievances despite repeated requests.  (See 24th Aff. Daker ¶ 8.)

A prison official's failure to provide a grievance procedure renders administrative

13] ¶ 8.)  Defendant Waters advances no content-based reason, in the alternative, for denying these books on the basis of content.

On this record, the Court concludes that a dispute of fact exists concerning whether Defendant Waters denied Plaintiff the above-referenced books on the basis of content.  Because Defendant Waters has offered no argument, in the alternative, for denying these books on the basis of content, the Court concludes for the same reasons discussed above that Defendant Waters is not presently entitled to qualified immunity.

        c.      (34) *Georgia Criminal Trial Practice*, (35) *Georgia Criminal Trial Practice—Forms*, (36) *Georgia Handbook on Criminal Evidence*, (37) *Green's Georgia Law on Evidence*

Plaintiff contends that, on February 4, 2005, while he was incarcerated at Central State Prison, Defendant Hilton Hall denied him four legal books, (34) *Georgia Criminal Trial Practice*, (35) *Georgia Criminal Trial Practice—Forms*,

---

remedies unavailable.  See Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (holding that, in order for administrative procedures to be "available," they must be "immediately utilizable"); see also Lane v. Doan, 287 F. Supp. 2d 210, 211-13 (W.D.N.Y. 2003) (holding that PLRA's exhaustion rule requires only that prisoner employ "reasonable attempts" to fully prosecute his grievance).  This Court has previously concluded, in a separate action brought by Plaintiff, that an administrative procedure was not "available" to him during his incarceration between August 11 and August 23, 2003, at Dodge State Prison.  See Daker v. Ferrero, No. 1:03-CV-2526-RWS (N.D. Ga. Nov. 24, 2004) (Doc. No. 31), at 7-8.

      In view of Plaintiff's sworn testimony and this Court's prior findings, the Court concludes he exhausted all available administrative remedies with respect to the books at issue.

(36) *Georgia Handbook on Criminal Evidence*, and (37) *Green's Georgia Law on Evidence*, based upon their content.  Plaintiff testifies that, "[i]n denying the books, Hall first stated the books aid in crime.  When I stated they did not, Hall then stated that I could not have the books because I do not need them because the prison had a law library."  (24th Aff. Daker [258-5] ¶ 23.)

Defendant Hall responds by stating that the above books were denied because "inmate Daker did not submit package request forms between April 5, 2004 and October of 2005, for any of the listed books.[13]  (See 3rd Aff. Hall [253-14] ¶ 28.)  Plaintiff has responded to Defendant Hall's contention by entering into evidence a copy of a Package Request Form dated January 7, 2005, which requests four books from West Publishing Company.  (See Ex. V to 24th Aff. Daker [258-5].)  The form further indicates, by signature of the warden's designee, that the Warden approved Plaintiff's request for the four books.  Plaintiff has also entered into evidence an Inmate Property Disposal agreement, dated February 2, 2005, which indicates that four books were denied for unspecified reasons.  (See Ex. U to

---

[13] Defendants also contend that Plaintiff failed to filed a grievance with respect to  the four books described above.  Nevertheless, Plaintiff testifies that he filed Grievance # 0531-04-0006 relating to the content-based denial of books while he was incarcerated at the Central State Prison in February of 2005.  (See 24th Daker Aff. [258-5] ¶ 33.)  Defendants have not genuinely disputed Plaintiff's sworn assertion that he filed an appropriate administrative grievance with respect to this book.  On this record, the Court concludes that Plaintiff has demonstrated that he exhausted administrative remedies as required by the PLRA.

24th Aff. Daker [258-5].)  Defendants do not contest that these forms evidence Plaintiff's request for the four books, but respond that the books were "most-likely denied because Plaintiff possessed too much personally [sic] property."  (Defs.' Resp. to PSMF [263] ¶ 23.)

On this record, the Court concludes that a dispute of fact exists concerning whether Defendant Waters denied Plaintiff the above-referenced books on the basis of content.  Because Defendant Hall has offered no legitimate content-based reason, in the alternative, for denying these books, the Court concludes for the same reasons discussed above that Defendant Waters is not presently entitled to qualified immunity.

> d.    (43) *Ragnar's Guide to the Underground Economy* and (44) *Investing Offshore*

Plaintiff contends that, on April 19, 2005, while he was incarcerated at Central State Prison, Defendant Warden Benton denied him (43) *Ragnar's Guide to the Underground Economy* and (44) *Investing Offshore* on the basis of content. Plaintiff testifies that he "was told by Ofc. Saulsbury that Warden Benton denied [these] books based upon their content."  (24th Aff. Daker [258-5] ¶ 29.) Defendants respond that these books "were likely denied due to excessive property."  (Defs.' Resp. to PSMF ¶ 29.)  They do not, however, provide an alternative content-based reason for their denial.

41

On this record, the Court concludes that a dispute of fact exists concerning whether Defendant Benton denied Plaintiff the above-referenced books on the basis of content.  Because Defendant Hall has offered no legitimate penological reason for denying these books on the basis of content, the Court concludes for the same reasons discussed above that Defendant Waters is not presently entitled to qualified immunity.

> e.     *Conclusion*

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's content-based denial claims with respect to (17a) *Revolution by the Book*, (20) *Practical Electronics*, (21) *Lip Reading Made Easy*, (22) *HansWehr Arabic English Dictionary*, (23) *Que Tal?*, (24) *C++ from the Ground Up*, (25) *Visual Basic from the Ground Up*, (34) *Georgia Criminal Trial Practice*, (35) *Georgia Criminal Trial Practice—Forms*, (36) *Georgia Handbook on Criminal Evidence*, (37) *Green's Georgia Law on Evidence*, (43) *Ragnar's Guide to the Underground Economy*, and (44) *Investing Offshore*, their Motion is **DENIED**. Because the Court concludes that a dispute of fact exists concerning the reasons for their denial, however, Plaintiff's Motion for Summary Judgment is also **DENIED**.

**F.      Qualified Immunity With Respect to Plaintiff's Procedural Due Process Claims**

Plaintiff also alleges that Defendants denied him notice and an opportunity to appeal numerous decisions to deny him mail (Claim 4) and the decisions to deny him the publications listed above (Claim 7 and 14).

Prisoners are entitled to "minimum procedural safeguards" in the context of decisions to exclude materials otherwise protected under the First Amendment. See Procunier v. Martinez, 416 U.S. 396, 417, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), overruled on other grounds by Thornburgh, 490 U.S. at 413-14.  The reason for such protection is that the interest in communications and access to information is "plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment."  Id. at 418.  In this Circuit, such due process protections entail: "(1) appropriate notice, (2) a reasonable opportunity to challenge the initial decision, and (3) an ultimate decision by a disinterested party not privy to the initial censorship decision."  Guajardo v. Estelle, 580 F.2d 748, 762 n.10 (5th Cir. 1978).[14]  Applying these requirements, the Eleventh Circuit in Owen v. Willie, 117

---

[14] The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

F.3d 1235, 1237 (11th Cir. 1997), endorsed a procedure in which a notice was sent to the prisoner stating that the mail had been received and was being held with the prisoner's property, pending release from the correctional facility.  Prisoners dissatisfied with the prohibition of certain items could file an internal grievance, which itself provided for three levels of review.  Id.

Plaintiff argues that, while GDC Operating Procedures ostensibly require notice, an opportunity to appeal, and a determination by a disinterested party, these procedures were not followed at the institutions in which he has been incarcerated. In a previous Order, the Court concluded that Plaintiff was entitled to preliminary injunctive relief on his procedural due process claims.  (See Order of Aug. 15, 2005 at 20.)  The Court found that Plaintiff had presented "voluminous evidence," in addition to Defendants' own admissions, that Defendants had not provided him with the requisite procedural due process upon denying him mailings or publications.  (See id.)

Since the entry of that Order, Defendants have entered little evidence in the record disputing Plaintiff's initial allegations of denial of due process.  From the Court's review, it appears that the process afforded to Plaintiff was, at best, as follows:  Upon denial of the publication, the prison official informed Plaintiff of the reasons for the warden's decision to deny.  The prison official then filled out a

"Property Disposal Form," described above, which did not contain any specific reference to the book's title or the reasons for denial, and acquired Plaintiff's signature.  After such notice was provided, Plaintiff could aggrieve the process through the traditional 3-step grievance process.[15]

Plaintiff alleges, however, that on numerous occasions, notice and an opportunity to respond was not provided to Plaintiff.  For example, Plaintiff contends that on May 28, 2003, Defendant Benton denied Plaintiff mail from Plaintiff's brother which contained a copy of the Post Office rates and fees chart that was downloaded from the internet.  "The material was rejected and destroyed without written notice to Daker, documentation of the rejection . . . and without either Daker or his brother being given an opportunity to appeal."  (See PSMF ¶ 27; 23rd Aff. Daker ¶ 27.)  While Defendants "dispute as written" Plaintiff's allegation, Defendants offer no specific evidence refuting Plaintiff's allegations, and do not state that proper notice or an opportunity to respond was afforded to Plaintiff.  (See Defs.' Resp. to Pl.'s SMF ¶ 27.)

-----

[15] It appears that Defendants also occasionally refer a publication to the GDC's Publication Review Committee, mostly when the facility "cannot determine admissibility" of the publication.  (See Defs.' Resp. to PSMF ¶ 1.)  Nevertheless, it appears that no publication denied to Plaintiff was ever referred to the Publications Review Committee, and thus Plaintiff's sole avenue for review was the prison grievance procedure.

Furthermore, Defendants admit that in February 2005, Plaintiff received from a publisher the books *Criminal Investigation: Basic Perspectives* and *Law Enforcement Technology: 260 Criminal Investigation*. Defendants also admit that, after denying Plaintiff these books, Plaintiff was not provided an opportunity to appeal their denial. While not providing any argument on the issue in their summary judgment papers, Defendants state that the reason provided to Plaintiff for the denial was "the appeals process did not apply because the books were not weekly or monthly publications." (See Defs.' Resp. to Pl.'s SMF ¶ 52.)

Plaintiff also claims that after Defendants denied three catalogs from *Fantagraphics* Books, he requested to appeal the decision to the Publications Review Committee. Plaintiff alleges that he was denied the opportunity to appeal that decision because "it doesn't matter, Capt Jones said you can't have them because they have nudity." (See Pl.'s SMF ¶ 58.) After being denied the book *Guide to Getting it On* for similar reasons, Plaintiff again claims being denied an opportunity to appeal, to which Defendant Benton responded, "I don't want to hear it. You go home next week." (See id. ¶ 59.)

Having reviewed the record, the Court finds that a dispute of fact exists concerning whether Defendants denied Plaintiff procedural due process on one or more occasions while he incarcerated at GDC facilities. Moreover, Defendants'

shifting explanations and silence with respect to many of Plaintiff's allegations

give the Court little basis to determine the constitutionality of the process afforded

to Plaintiff after the denial of mailings and publications.  See Myron, 196 Fed.

Appx. at 604 (reversing district court's dismissal of prisoner's First Amendment

claims because "the record does not yet contain any justification for the

restriction"); Jean, 727 F.2d at 983-84.  Plaintiff has asserted numerous instances

of denials of notice and opportunities to appeal rejections of mailings and

publications by Defendants.  A dispute of material facts remains as to these claims.

Furthermore, as the Court has previously found, the law of Guajardo v.

Estelle clearly established the procedural due process requirements accompanying

the denial of prisoner mailings and publications.[16]  (See Order of Feb. 26, 2007 at

---

[16] It appears that Defendants have advisedly abandoned their argument raised in the first round of summary judgment briefing, in which they suggested that the denial of mail or publications on the basis of procedural infractions does not trigger the procedural due process protections of Guajardo.  Unfortunately, however, they have replaced that argument with an even less tenable one.

Defendants argue that, because Guajardo and Owen concerned publications denied for sexually explicit content, that the law of procedural due process was only clearly established with respect to the denial of sexually explicit publications.  Guajardo and Owen both recognize, as the Supreme Court did in Procunier, that access in prison to uncensored mailings and publications—regardless of their content—implicate a "liberty" interest protected by the Fourteenth Amendment.  See Procunier, 416 U.S. at 417 (finding that the "interest of prisoners in uncensored mailings is "plainly a 'liberty' interest within the meaning of the Fourteenth Amendment"); Guajardo, 580 F.2d at 762 (outlining post-denial procedure to which prisoners are entitled for denial of publications); Owen, 117 F.3d at 1238.  Denial of mailings and mailed publications must therefore be accompanied by sufficient legal process, regardless of content.  Because of the unconditional and absolute nature of that due process right, Procunier and its progeny provide prison officials more than "fair warning" that they must notify prisoners of the denial of *any* mailing or publication, and provide them an adequate opportunity to respond.

73.)  Accordingly, insofar as they relate to Plaintiff's procedural due process claims, Defendants' Motion for Summary Judgment is **DENIED.**

Moreover, because a dispute of fact exists concerning the nature of the process afforded to Plaintiff with respect the denied publications and mailings, Plaintiff's Motion for Summary Judgment is **DENIED**.

### Conclusion

For the foregoing reasons, Defendants' Motion for Motion for Reconsideration [249] is **GRANTED**.  Insofar as the Court's Order of February 26, 2007, awards summary judgment in favor of Plaintiff and against Defendants Benton and Jones on the liability aspect of Plaintiff's retaliation claim (Claim 18), the Court **VACATES** that portion of its Order and **DENIES** Plaintiff's motion for summary judgment on the liability aspect of Plaintiff's claims of retaliation by Defendants.

Defendants' Supplemental Motion for Summary Judgment [253] is **GRANTED in part and DENIED in part.**  It is denied insofar as it seeks summary judgment on Plaintiff's First Amendment claims with respect to (17a) *Revolution by the Book*, (20) *Practical Electronics*, (21) *Lip Reading Made Easy*, (22) *HansWehr Arabic English Dictionary*, (23) *Que Tal?*, (24) *C++ from the*

———————————————

Hope, 536 U.S. at 740.

48

*Ground Up*, (25) *Visual Basic from the Ground Up*, (34) *Georgia Criminal Trial Practice*, (35) *Georgia Criminal Trial Practice—Forms*, (36) *Georgia Handbook on Criminal Evidence*, (37) *Green's Georgia Law on Evidence*, (43) *Ragnar's Guide to the Underground Economy*, and (44) *Investing Offshore*, and insofar as it seeks summary judgment on Plaintiff's procedural due process claims.  It is granted insofar as it seeks summary judgment on all of Plaintiff's claims with respect to (1) *The Catalog of Catalogs VI* ; (2) *Mathematical Cryptology*, (3) *Applied Cryptography*, and (4) *Using Microsoft Visual InterDev*; and Plaintiff's First Amendment claims with respect to the remainder of the books.

Plaintiff's Motion for Summary Judgment [258] is **DENIED**.

The parties are **DIRECTED** to file their proposed pretrial orders within twenty (20) days of the entry of this Order.

**SO ORDERED** this   24th   day of August, 2007.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE